ATTORNEY GENERAL OF UTAH v. POMEROY et al.

No. 5669. Decided October 27, 1937. (73 P. [2d] 1277.)

Rehearing Denied December 31, 1937.

428

430

*Joseph Chez,* Atty. Gen., and *Burton W. Musser* and *Henry D. Moyle,* both of Salt Lake City, for appellant.

*Irvine, Skeen & Thurman, E. A. Walton, L. J. Bradford,* and *L. H. Callister,* all of Salt Lake City, for respondents.

WOLFE, Justice.

The Attorney General filed, on April 14, 1934, a complaint against the receiver of the White Star Gas & Oil Company, Jack W. T. Pomeroy, Clara Pomeroy, his wife, and the Starlene Gas & Oil Company, the object of which was to collect, under authority of section 57-12-11, R. S. Utah 1933, a gasoline tax imposed by chapter 39, Laws of Utah 1923, as amended and carried into chapter 12, title 57, R. S. Utah 1933 (57-12-1 et seq.), on the sale or use of motor fuels and alleged to be owing the State. The complaint is long and, as needed, we shall quote parts of it in considering the various theories which it reflects as a basis for the collection of these taxes.

It is alleged that the White Star Gas & Oil Company, hereinafter called the White Star, was engaged in Utah in "the business of retailing and distributing motor vehicle fuels." The defendant Pomeroys are joined on the theory that they operated and controlled the White Star and that they "used the income and assets of said company as their own, wholly ignoring the corporate existence of the White Star"; "that from and after July 22, 1929, the corporation was a mere name under which the said individual defendants conducted

the business of purchasing, selling and distributing gasoline to themselves and other persons"; that the said Pomeroys "leased, operated and maintained various service stations in the State of Utah under the registered trade name of 'White Star Service Station.'" The complaint sets out various devices by which it is alleged the Pomeroy's obtained the property of the White Star in fraud of creditors and especially of the State: One by selling gasoline from the White Star to themselves for less than cost; another by the taking by them of discounts supposedly made to customers; another by the execution of a chattel mortgage in favor of Jack W. T. Pomeroy covering all of the property of the White Star and the foreclosing of same by advertisement and the purchase by said Pomeroy.

It is alleged that by the foreclosure and purchase of the property so mortgaged, the White Star was stripped of all its assets and that this property was conveyed to the Starlene Gas & Oil Company, hereinafter called the Starlene; that the Starlene was likewise controlled, owned, and managed by the two Pomeroys; and that this new corporation was in effect another name for the Pomeroys in conducting their business.

The complaint, therefore, proceeds on the theory that the White Star owed the State gasoline taxes for October, 1932, $3,484.72; for November, 1932, $1,466.84; and for December, 1932, $1,596.76, which were never paid and which could not be collected because of the alleged abstractions of corporate property by the Pomeroys, together with penalties of 25 per cent, amounting, respectively, to $871.18, $366.71, and $398.94, in addition to interest at the rate of 12 per cent per annum on the tax sums and penalties from the 15th of the succeeding months for which the taxes were payable. It, in effect, amounts to a suit for judgment against the White Star together with a creditor's bill to follow assets into the hands of the Pomeroys and the Starlene.

We think the allegations of the complaint also reflect another theory which in the consideration of this case, as will

later appear, plays much importance. This is the theory that the Pomeroys were in reality the purchasers of the gasoline using the name of the White Star. There is a difference in the conception of the White Star being the purchaser of the gas and therefore the debtor to the State with effort to pursue its assets and collect such a judgment, and the conception that the Pomeroys while selling gas at retail were really also the purchasers at wholesale and distributors, using a corporate entity or name to accomplish such purpose. The legal results of these two conceptions will become apparent when we consider the question of whether the claims of the State were barred by the statute of limitations.

Allegations of the complaint which, in part, reflect this theory are as follows: "That at all times herein mentioned, it was the established practice and course of business of the defendants, Jack W. T. Pomeroy and his wife, Clara Pomeroy, *doing business as the White Star Gas & Oil Company,* and of the White Star Gas and Oil Company, a corporation, in selling motor vehicle fuels at retail, to specifically include in the retail price thereof four cents per gallon as and for and on account of the aforesaid tax, and did actually collect from its retail customers the said four cents per gallon tax for the use and benefit of the State of Utah," etc. It is claimed that this is the basis for an action for moneys had and received for the use and benefit of the State in addition to the action for an indebtedness. There are other allegations of like character largely in the nature of repetition of idea, if not of words. In fact, the allegations of the complaint taken as a whole make it difficult to determine just what theories the plaintiff does rely on. In the very part last above quoted and in the allegations earlier quoted that the Pomeroys "leased * * * service stations * * * under the * * * name of 'White Star Service Station,'" there seems to be involved the idea of the White Star having been the purchaser at wholesale and itself the retailer confused with the conception that the White Star was the alter ego for the Pomeroys and that they were, as before stated, the real purchasers

at wholesale and also the retailers. In other words, some of the allegations of the complaint give support to the theory that the Pomeroys were in reality the alter ego for the White Star, instead of the White Star the alter ego of the Pomeroys; but since the Pomeroys owned and controlled retail stations which are not seriously urged to be the property of the White Star, we must assume that this theory is to be excluded and the theory that the White Star was the cover or another name for the Pomeroys, rather than that the Pomeroys were another name for the White Star, is the only tenable theory reflected by the complaint in addition to that first above-mentioned, to the effect that the White Star was the real purchaser, distributor, and debtor of the State and that the claim of the State was therefore against it with effort to pursue assets allegedly taken by the Pomeroys in order to obtain satisfaction. We will later have occasion to take up these theories more in detail.

Having given enough of the allegations of the complaint or the substance thereof to reflect the various theories, we may proceed with the next steps in this legal drama. It appears in the first place that one Ralph Carter on March 24, 1933, obtained a judgment against the White Star for $12,543.10. On May 3, 1933, Anton Strebel was appointed receiver of the White Star, "with full authority to take into his possession all of the business assets, choses in action, bonds, papers of said White Star"; that he duly qualified as such receiver and since said May 3, 1933, acted as such. Thus was the said Strebel as receiver joined as a defendant by plaintiff.

The receiver, in a cross-complaint against the Pomeroys, adopted the allegations of the complaint as regards the alleged fraud of the Pomeroys and their abstraction of the assets of the White Star and prayed for the recovery and retaking by the White Star of the said claimed assets and for an accounting by the Pomeroys and for the subjecting of said assets whether found in their original or in a converted or transmuted form to the judgment of the said Carter.

Thus, it should be noted that in the original cross-complaint Strebel, the receiver, mainly relies on the one theory that the Pomeroys have wrongly abstracted assets of the White Star. There was already judgment against the White Star, and he only attempted to follow assets in order to subject these assets or their equivalent to the said judgment, whereas the plaintiff seeks to require the Pomeroys and the Starlene to account for the taxes, interest, and penalties, meanwhile enjoining them from transferring or encumbering their property, on the basis of the two theories above stated. But in a later amendment to the cross-complaint, filed on August 3, 1934, Strebel alleges not only as in his original cross-complaint that the White Star was a dummy corporation completely controlled by the Pomeroys, but further that the White Star and Starlene were "mere agencies and instrumentalities of the Pomeroys" and in effect merely the assumed names under which "the Pomeroys conducted their business." Thus Strebel at least after the amendment appears to rely also on the theory that it was not the White Star business controlled by the Pomeroys, but the Pomeroys' business carried on under the name of the White Star.

The part of the prayer of the complaint which seems to reflect the theory that the Pomeroys and the Starlene had received moneys for the use and benefit of the State reads as follows:

"and that said injunction remain in force until said tax is fully paid and said defendants have fully accounted to the State of Utah *for all moneys which they may have collected as a tax upon the sale of gasoline in the State of Utah, whether said gasoline was sold to them in their own names or in the name of the White Star Gas & Oil Company.*" (Italics supplied.)

The Starlene and the Pomeroys questioned Strebel's right to raise by a cross-complaint against the said defendants the same issues raised by the Attorney General against the defendants. Question was also raised as to the right of the Attorney General to bring suit against the Pomeroys directly

instead of petitioning the court to require the receiver to do so. Whatever the ruling on such questions, they are not up for adjudication in this appeal.

On June 21, 1934, the Attorney General *and* Anton Strebel, as plaintiffs, brought a so-called ancillary action against the Pomeroys, the Starlene, and the Walker Bank & Trust Company, in which the gist of the former action was set out, together with allegations that a deposit of about $13,000 in the Walker Bank in the names of the Pomeroys and Starlene was derived from assets of the White Star, and praying that said funds be sequestered and that the bank be held as a stakeholder. The bank answered by making tender and offering to deposit with the clerk of the court the sum of $15,377.30 in the Jack W. T. Pomeroy account, $155.33 in the account of Clara Pomeroy and $4,822.54 in the account of the Starlene. The court ordered the funds accepted, receipt to be given, and the bank discharged as stakeholder. On June 30th an order was made requiring the clerk to pay to Frank Archer, who was previously appointed operating receiver for the Starlene and for Jack Pomeroy, the moneys formerly paid by the bank to the clerk on behalf of the Starlene and the $15,377.30 (which included $44.67 formerly in Jack W. T. Pomeroy's savings account not mentioned above), which latter money was to be held by said receiver "as part of the assets of the defendant Jack W. T. Pomeroy." The said sums were used by the said receiver in operation of the business of the Starlene and Jack Pomeroy.

On July 30, 1934, three months after the defendants Pomeroy and Starlene filed their first demurrer and after the trial had been in progress intermittently for two and a half months and after the plaintiff's evidence was all in and he had rested, the said defendants filed amendments to their answers alleging that the said "action, if any, is barred by the provisions of the Statute of Limitations of the State of Utah, being 104-2-20 and 104-2-26, Revised Statutes of Utah 1933." Since point is made that the defendants should have

pleaded the statute of limitations contained in the 1917 Compilation in order to plead complete bar by the elapse of one year, and not the sections in the 1933 Revision, we have set out in haec verba above this part of the answer.

The amendments were allowed upon imposition of costs, or it would be more accurate to say that the motion to strike (see infra) said amendment was denied on condition that taxable costs be assessed against defendants. Plaintiff assigns the court's order permitting the statute to be set up after the trial had been so long in progress as error on the ground that such defense had been waived by undue delay. At this point, although it may be somewhat out of order, but to dispose of it while in the reader's mind, we now make disposition of such contention. We do not think the court abused its discretion in permitting the defense of the statute of limitations to be filed. The court made as a condition of filing said amendment an agreement by defendants to pay costs from the time of defendants' first answers to the time of proffering of the amendment. Moreover, it was somewhat difficult from the allegations of the complaint, as we have before intimated, to know on just what theory plaintiff would proceed. Although we cannot condone the practice of waiting for such length of time, yet when the allegations of the complaint raised the theory of an obligation to the State on the part of the White Star to pay the tax, which may have involved the one year statute, and at the same time the theory of an obligation to pay over moneys had and received—an obligation separate and apart from that raised by the gasoline tax law on distributors and retailers where the tax was actually collected, as we shall later point out—the remissness of defendants to plead the one-year statute may be somewhat excused.

On August 6th, Strebel also pleaded by amendment the one-year statute of limitations against the plaintiff. On August 7th, plaintiff filed a long motion to strike the amendment *to the answers of the Starlene and the Pomeroys,* which pleaded the statute of limitations. No motion to strike the

amendment of Strebel which set up the same statute of limitations was made. On September 18, 1934, the court entered its order granting a nonsuit and dismissal as to plaintiff in favor of the Starlene and the Pomeroys. This was in pursuance of the granting of the motion of said defendants for nonsuit and dismissal filed on July 30th. The motion for a nonsuit and dismissal by defendants Pomeroy and Starlene against the cross-complainant Strebel was denied. Because of the motion of the Starlene and the Pomeroys to dismiss this appeal on the ground that the judgment was not a final one, the order of nonsuit and dismissal are, in part, herein set out. It reads:

"The defendants Jack W. T. Pomeroy, Clara Pomeroy, and Starlene Gas and Oil Company, a corporation, each having filed herein a motion for nonsuit and dismissal of the complaint herein * * * it is hereby ordered that said motion, and each and all of them, so filed by the *said defendants* for non suit and dismissal as to the plaintiff herein, be, and the same are hereby granted and the *plaintiff's complaint is dismissed,* the plaintiff to recover his actual taxable costs incurred in the trial of said action from the time of filing the answers of the defendants to the time of proffering by the defendants of their amendment to answer setting out the Statute of Limitations." (Italics added.) (These costs were those which the court had formerly assessed against the defendants as a condition for denying the motion to strike the amendments. The cost bill filed for this period was for $1,066.70.)

As we are now to consider defendants' motion to dismiss the appeal as not being from a final judgment, it should be noted and kept in mind that Strebel, although he amended his answer to plaintiff's complaint on August 5th by pleading the statute of limitations, had made no motion for nonsuit or dismissal, and the order above quoted from referred only to the motion of the Starlene and the Pomeroys. Consequently, there is actually no judgment of nonsuit or dismissal in favor of Strebel against the plaintiff. The issue of the statute of limitations as to Strebel and plaintiff is still to be ruled on. The plaintiff technically is not entirely out of the case. All his evidence is in. All the evidence which would

permit the court to say whether the one-year statute is applicable in favor of Strebel is in. Plaintiff is in the peculiar position of not being able hereafter, unless he obtains a reversal, to proceed in the case, because he cannot further prosecute his case against the Starlene or the Pomeroys nor meet any evidence they may introduce against Strebel, he being finally through as far as they are concerned. And he has concluded his case as far as Strebel is concerned. All the evidence which Strebel requires to obtain his judgment of dismissal on the basis that the one-year statute of limitations has run in his favor has been introduced. If the plaintiff cannot appeal before a judgment is entered which concludes him entirely, he must stand aside awaiting the day when he can be judicially executed by an order of dismissal and nonsuit against him in favor of defendant Strebel, in the meantime helplessly standing on the sidelines watching the contest between the cross-complainant Strebel and the defendants. And if he should await the time when that contest was completed or until such time as Strebel may make his motion for a nonsuit against plaintiff in order that there might be a completed final judgment against him from which he could appeal, if it requires such type of finality to appeal from, he would, in case he obtained a reversal, require an introduction again of almost all the evidence which the defendants introduced in the contest between themselves and Strebel and to which he had no opportunity to object or meet and his rebuttal. The parties might, of course, stipulate that he might remain a tentative party in the trial subject to the ruling of this court on appeal.

Small wonder that plaintiff has taken this appeal on the theory that an appealable judgment was rendered against him. Perhaps the lower court should not have ruled on the statute of limitations until the end of the trial and after all the evidence was in, which would itself appear to work a hardship on plaintiff in requiring him to contest in futility only to find himself finally ruled against on this one-year statute of limitations. It would then have caused him need-

less expense and trouble unless he was fortunate enough to obtain a reversal in this court. The anomaly arises by virtue of Strebel's cross-complaint against the other defendants. We are not now called upon to decide whether the other defendants should have been joined with Strebel by plaintiff in the suit. The fact is they are in this suit. The cross-complaint, therefore, makes two suits at right angles with each other. From any viewpoint the situation is an awkward one. If in any situation like this the plaintiff may appeal from a judgment of dismissal in favor of one or more defendants, leaving something still to be decided between him and a remaining defendant or defendants, it either means that some of the issues may have to be tried over again, which is a hardship on all parties, or that the suit as to the remaining defendants will have to await the decision of the review court on the judgment of dismissal, which may be a hardship on them.

We mention these matters, not because of any intention to interfere with the rule that ordinarily there is an appeal from a final judgment only, but in order that they may be taken into consideration in determining when a judgment is final in the sense that it is appealable. Certainly, this judgment of nonsuit and dismissal was final as between the plaintiff and the defendants Starlene and Pomeroys. Plaintiff, as to them, was fully out of the case. The following questions suggest themselves: Must a judgment to be appealable be final as to all parties? For an appeal by either one or more plaintiffs or by one or more defendants, must it be final as to all the issues raised between all the plaintiffs and all the defendants, if not between the cross-complainant and the other defendants?

An examination of a large number of cases, including those of this jurisdiction, reveals a number of general rules and expressions for the test of a final judgment, but reveals more obstinately that there are some cases which either do

not yield to these general rules or expressions or are exceptions to them. We shall take occasion to discuss the rules laid down in these cases, but before doing so we must dispose of plaintiff's contention that in this case there is a final judgment because the order above quoted decrees that "the plaintiff's *complaint* is dismissed," etc. Assuming for the moment that were this so the judgment, even though it did not dispose of the issues raised by the cross-complaint, would be final, we cannot read the order of dismissal any broader than the motion in response to which it is a ruling. The preamble of the order specifies that the defendants Jack W. T. Pomeroy and the Starlene, each having filed a motion, etc. It does not mention Strebel, nor did Strebel make any such motion. The order itself states, "that the said motion, and each and all of them [which includes none of Strebel] for nonsuit and dismissal as to the plaintiff herein be and the same is granted." It grants no motion which was not made, but only those which were made. The fact that the order states that "the plaintiff's complaint is dismissed," must be read, "the plaintiff's complaint is dismissed as to the defendants Starlene and the Pomeroys," the only ones who moved for dismissal. The failure to particularly specify this is of no moment compared with the intent shown by the remainder of the order and the presumption which must be indulged that the court would not ordinarily dismiss a complaint as to a defendant who had not asked for dismissal.

We do not mean by this to hold that in certain cases, of which this may be one, a dismissal as to some defendants is tantamount to a dismissal as to all, when inevitably it must ultimately result in such dismissal as to all because all are subject to the law of the case which has been established by the ruling. We mean only to hold that where a motion is made by one or more defendants not joined in by the others and the complaint is dismissed without specifying that it is dismissed only as to the moving de-

fendants, it will ordinarily be construed as a dismissal only as to those moving defendants. If it is construed as being a dismissal as to the other defendants, it will not be because of the failure to specify as to the moving defendants only, but because of a more controlling paramount principle of intention by the trial court definitely shown to dismiss the complaint as to all defendants.

The case of *Mayer* v. *Rankin*, 91 Utah 193, 63 P. (2d) 611, 110 A. L. R. 837, appears somewhat contrary to this, but is not when fully understood. In that case, Rankin was served but did not appear. The other defendant, Fidelity & Casualty Company, filed demurrers to all six causes of action and ultimately the demurrers were sustained. Plaintiff did not plead over and upon motion of the Fidelity Company the action was dismissed. There it was plainly the intent of the court to dismiss the action as to *both* defendants. Rankin was a nonlitigating party. The court, having held the complaint inadequate, could not have given plaintiff judgment on it even in view of Rankin's default. Therefore, if a judgment of dismissal as to the only litigating defendant was not held as final, plaintiff would have struck an impasse. He could not, without amending his complaint and perhaps reserving Rankin, have gotten any judgment against him, and if he did amend and again serve Rankin, he could not have tested out the sufficiency of his original complaint as against the bonding company. If he waited to test that and stand on his complaint, accepting a judgment of dismissal as against the bonding company, leaving Rankin in the case, we would have had to consider the whole case dismissed or that a judgment of dismissal as to one defendant was a final judgment from which plaintiff could appeal. We chose to assume in order to unlock that situation that the court intended to and did dismiss the whole action, which was the way the order read. But even in that case the concurring opinion noted that the motion to dismiss was only made by the bonding company and not by Rankin, and that its motion only asked that the causes of action "be dismissed as to this

defendant"; "this defendant" being only the bonding company. But it was noted that the whole action was nevertheless by the order dismissed which left no doubt of the plaintiff's right to appeal.

But in the instant case, as above stated, the order itself plainly shows an intent to dismiss only as to those who moved for dismissal. And ordinarily an order will not be construed as going beyond the motion in pursuance of which it is given. It should be remarked in passing that a nonlitigating party cannot prevent a judgment from being final as to litigating parties or a party who never appeared might in some cases prevent an appeal. The Mayer Case is an illustration. The nonappearing defendant could not move for dismissal. The litigating defendant would not or perhaps could not move for dismissal of the action except as to himself. The plaintiff perhaps could not amend his complaint to satisfy the court that he had stated a cause of action against both defendants or perhaps he might choose to stand upon it and later appeal. But unless he obtained judgment in favor of himself against Rankin, which he could not do under a complaint held insufficient, or unless the court itself dismissed the whole action, or unless this court held in such case that a dismissal in favor of litigating defendants was a final judgment from which plaintiff could appeal, there would be a denial of a right of appeal. This case illustrates what we shall hereafter endeavor to show, that the matter of what is a final judgment for appeal purposes depends partly upon the situation and cannot altogether be covered by set rules. The paramount policy of the law is to permit litigants to obtain review of the rulings of trial courts. There is another policy almost equally potent, that is, that cases shall not be appealed piecemeal or in installments. When properly analyzed, it will be found that what constitutes a final judgment will be determined by a practical application of these two policies. We shall have occasion later to discuss them more at length.

Going back to the former point of departure, we must then test out the finality for purposes of appeal of the judgment of dismissal of the complaint as operative only in favor of the Starlene and the Pomeroys, technically leaving in the case the plaintiff as a contending party against Strebel and the issues as between those two as technically undecided.

This brings us directly up against the question of what is a final judgment. One of the oldest cases on this point in this jurisdiction is *North Point Consol. Irr. Co.* v. *Utah & S. L. Canal Co.*, 14 Utah 155, 46 P. 824, 826. In that case it was said:

"The word 'final' or 'final judgment' has a plain meaning [we wish we could say it was as plain as this case seemed to find it]. A judgment, to be final, must dispose of the case as to *all* parties, and finally dispose of the subject-matter of the litigation on the merits of the case. *Champ* v. *Kendrick*, [130 Ind. 545], 30 N. E. 635. Bouvier defines a final judgment as used in opposition to interlocutory as 'A final judgment is a judgment which ends the controversy between the parties litigant.' 'The general rule recognized by the courts of the United States and by the courts of most, if not all, of the states, is that no judgment or decree will be regarded as final, within the meaning of the statutes in reference to appeals, unless all the issues of law and of fact necessary to be determined were determined, and the case completely disposed of, so far as the court had power to dispose of it.' Freem. Judgm. § 34" (Italics supplied.)

The North Point Case made the matter of determination of a final judgment extremely important because it held that this court does not have, under our Constitution, *jurisdiction* to entertain any appeal from other than a final judgment. This, of course, means that the question of disallowing an appeal from other than final judgments rests, not on the immemorial custom or policy of the common law based on reasons of economy and orderliness of litigation, but on constitutional jurisdiction of this court. It means that the Legislature, except in probate cases, does not have the power to permit appeals except from final judgments. If that case states the law, in order for the Legislature to obtain that power, the Constitution must be amended. In the case of

*Atwood* v. *Cox*, 88 Utah 437, 55 P. 2d 377, we discussed at length the necessity of this court taking cognizance, on writs of certiorari and prohibition, of errors where the consequences of the erroneous ruling would be irremedial if final judgment must be awaited before they could be corrected. We pointed out that the lack of mechanism to bring such rulings up for review had led this court and those of practically all jurisdictions to consider them on writs of certiorari or prohibition when in reality only error and not jurisdiction of the lower court was involved, and even though said writs were designed by our Constitution to prevent the assumption of unauthorized jurisdiction or to prevent the lower tribunal from acting in excess of jurisdiction. This would be only in the most exceptional cases.

If the North Point Case really states the law, it means that this court is prohibited by lack of jurisdiction and the Legislature cannot invest it with jurisdiction to consider any errors except on appeal from a final judgment. It further means that we cannot, except under the guise that we are preventing a wrong assumption of jurisdiction, prevent irreparable consequences by rulings in the lower courts. And if we do that under the guise of arresting a false assumption of jurisdiction, we confuse beyond clarification the real distinctions between error and jurisdiction. Unfortunately this has been the case in many jurisdictions. Necessity of arresting a lower tribunal in a matter which involved grievous and irremedial error, although only error, has lead the review courts to issue writs of prohibition with loose and generalized statements concerning lack or excess of jurisdiction when jurisdictional questions were never involved. See *Atwood* v. *Cox*, supra.

We think that the decision in the North Point Case, while correct in results, was placed upon incorrect grounds. The court was correct in deciding that an order pendente lite granting a temporary injunction was not a final order from which an appeal would lie, but we think it was not because

section 9, art. 8 of the Constitution, prohibited it, but because of the policy of the law. The North Point Case itself states: "The policy of the laws of the several states and of the United States is to prevent unnecessary appeals. It is not the policy of courts to review cases by piecemeal. The interests of litigants require that cases shall not be prematurely brought to the highest court." The decision should have been left on that basis and not on the basis that section 9, art. 8 of the Constitution, prohibited any appeals except from final judgments. The case concluded that the constitutional provision reading, "from all final judgments of the District Court there shall be a right of appeal to the supreme court," excluded any right of appeal from other than final judgments on the strength of the maxim, "Expressio unius est exclusio alterius." This maxim is not controlling in construing a statute or constitutional provision, but only one of the aids to determine intention.

There is a provision in the Constitution of the United States (Article 3, § 3), reading: "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to some overt Act, or on Confession in open Court." By applying the same reasoning to this provision as was applied to our constitutional provision by the North Point Case, the guaranty requiring conviction by not less than two witnesses would be construed to mean only two. A conviction could not be had by more than two or less than two. This illustrates how ridiculous the application of the above maxim may be in cases where the intent is plainly against the application of the maxim. The paramount principle of determining what was intended is what governs. The North Point Case held that the constitutional language contained in section 9 did not give a mere guaranty of the right of appeal in final judgments, reserving in the Legislature the right to grant appeals in other cases, but that it froze into the Constitution the ancient policy of the law and granted the right to appeal *only* from final judgments.

The vice of this interpretation is that it means that this court has jurisdiction *only* of appeals from final judgments. This takes away all flexibility in the matter of this court's entertaining appeals. Of course, if this court determines that a judgment is final, it is, as far as the right of appeal is concerned, final, whether final or not. Our determination as to the finality of a judgment will not be questioned by the Supreme Court of the United States. *Wheeling & Belmont Bridge Co.* v. *Wheeling Bridge Co.*, 138 U. S. 287, 11 S. Ct. 301, 34 L. Ed. 967. But theoretically it prevents us from exercising any discretion. We cannot do as some of the courts of review have done, to wit, entertain appeals in cases where it would work hardship to dismiss them owing to peculiar circumstances. "Owing to particular circumstances and hardships, the courts have refused to dismiss appeals from some judgments which did not completely dispose of the cases in which they were entered. Freeman on Judgments, Ch. 1, Sec. 35." *Peoria, Decatur & Evansville Ry. Co.* v. *Pixley*, 15 Ill. App. (15 Bradw.) 283. If the North Point decision is correct, a salutary policy of the law, but which had flexibility, has been frozen by the Constitution into a mandate not to take jurisdiction of appeals except they be from final judgments. We do not think this was the intention of the framers of our Constitution, nor do we think section 9, art. 8, of that instrument demands such interpretation. It was a guaranty that every litigant should have an appeal at least from a final judgment against him, but it was not a prohibition against this court retaining jurisdiction in every case except from a final judgment. That restriction comes from an ancient policy of the law and was not without some flexibility. At common law no writ of error could be brought except on final judgment. "No writ of error can be brought but on final judgment, or an award in nature of a judgment, for the words of the writ are, si judicium redditum sit, etc." Bacon's Abridgement, Error (A) 2. "If the writ be returnable before judgment is given it may be quashed on motion." "But where the writ

of error, on a judgment in the Common Pleas, was returnable in Easter Term, and the costs were not taxed and final judgment not signed until Trinity Term, after which the defendants in the Michaelmas Term, served plaintiffs with a rule to assign errors; and the plaintiffs having assigned them, the defendants in the same term joined in error, and the case being afterward argued, the judgment of the court of Common Pleas was reversed; the court of the King's Bench, under these circumstances, refused to quash the writ of error, on the ground that it was returnable before costs were taxes in the court below and consequently before any judgment was given in that court; as the defendants ought to have applied to quash it, in the earlier stage of the proceedings." 2 Tids Practice, 1162. This excerpt is given from this old work on pleading to show that it was not jurisdictional with the review court, but a policy of the law which was quite uniformly adhered to but not inflexible. If the reasoning of the North Point Case is correct and our jurisdiction depends on the finality of judgments, a decision given by us might be nugatory where it was afterward discovered that by inadvertence the judgment appealed from was not final although no one questioned it. If our right to pass upon assigned error depends upon the finality of the judgment appealed from and such judgment was not final, any decision or opinion we might make would be as if it had not been made.

In the light of these considerations, we think the North Point Case was not based on the proper grounds and we hold that section 9 of article 8 of the Constitution was a guaranty and not a restriction on the right of the litigant to appeal. Likewise, section 104-41-1, R. S. Utah 1933, was intended not to prevent this court from ever entertaining an appeal from other than what is technically a final judgment, but was meant to assure the right at all events from final judgments. We, however, adhere to the doctrine and policy of the law that, as stated by Mr. Justice Lamar in *McLish* v. *Roff*, 141 U. S. 661, 12 S. Ct. 118, 35

L. Ed. 893, a case cannot be brought to this court in fragments and that ordinarily a case will be dismissed where the appeal is not from a final judgment. While, therefore, we arrive at the same results as were reached in the North Point Case, we do not think a final judgment is a condition precedent to our jurisdiction, but is a condition precedent except in rare instances to our entertaining the appeal because of the ancient policy of the law based on sound principles. Having thus placed the principle that appeals to this court will be only from final judgments on a proper basis, we are in position to continue our consideration of the question as to whether the judgment of nonsuit and dismissal as to the defendants Starlene and the Pomeroys, leaving the issues between Strebel and the plaintiff as well as the issues between Strebel and the other defendants undecided, was a final judgment in the sense that an appeal could be taken from it.

The question of when a judgment is final is not only important for the purpose of determining whether this court will entertain the appeal, but because of the fact that appeals lie only within six months from the rendition of a final judgment. So any rule which misled might work a hardship either way. There is very little difficulty about a suit between two parties only or between two or more parties where the order is really interlocutory. A question of jurisdiction cannot be certified to the Supreme Court in advance of a final judgment in the case, *McLish* v. *Roff,* 141 U. S. 661, 12 S. Ct. 118, 35 L. Ed. 893; from a judgment granting an injunction which also requires defendants to account, before the accounting is made and adjudicated, *Keystone Manganese & Iron Co.* v. *Martin,* 132 U. S. 91, 10 S. Ct. 32, 33 L. Ed. 275; *Winters* v. *Ethell,* 132 U. S. 207, 10 S. Ct. 56, 33 L. Ed. 339. An order appointing commissioners in condemnation proceedings is not a final judgment nor subject to review until after the confirmation of the award of the commissioners. *American Union Teleg. Co.* v. *Wilmington, Columbia & Augusta R. Co.,* 83

N. C. 420; *Luxton* v. *North River Bridge Co.*, 147 U. S. 337, 13 S. Ct. 356, 37 L. Ed. 194; *Southern Railway Co.* v. *Postal Teleg. Cable Co.*, 179 U. S. 641, 21 S. Ct. 249, 45 L. Ed. 355.

"The decree, whether maintaining or dismissing the bill, disposes of a proceeding simply incidental to the principal matter in litigation and can only be reviewed on an appeal from the final decree disposing of the whole case." *Ayres et al.* v. *Carver et al.*, 17 How. (58 U. S.) 591, 595, 15 L. Ed. 179; *Ex parte South & North Alabama R. Co.*, 5 Otto (95 U. S.) 221, 24 L. Ed. 355.

And it is well settled in this jurisdiction that an appeal from what constitutes a finding merely as compared to a judgment which actually adjudicates the rights of the parties is not appealable. Thus, an appeal from a verdict where judgment has not been entered. *Kourbetis* v. *National Copper Bank*, 71 Utah 232, 264 P. 724. Nor from an order for judgment. *Ellinwood* v. *Bennion*, 73 Utah 563, 276 P. 159. Nor from a minute order dismissing appeal. *Robison* v. *Fillmore Commercial & Sav. Bank*, 61 Utah 398, 213 P. 790. Nor where order for but not judgment of dismissal is entered. *Lukich* v. *Utah Const. Co.*, 46 Utah 317, 150 P. 298; *Watson* v. *Odell*, 53 Utah 96, 176 P. 619. Nor from an order quashing summons without dismissing the action. *Honerine Min. & Mill. Co.* v. *Tallerday Steel Pipe & Tank Co.*, 30 Utah 449, 85 P. 626. Nor from an order denying a motion to correct a judgment. *Cullen* v. *Harris*, 27 Utah 4, 73 P. 1048. These cases from our jurisdiction give some idea of what constitute interlocutory orders in a case whether such orders affect some or all of the parties. The question becomes more difficult when there is a final judgment as to some parties but not as to others. Must the judgment be final between or among *all* parties, or may an appeal be taken where final, as in this case, between the plaintiff and three of the defendants, although not as to the fourth and not final as between said fourth defendant and the other three on the cross-suit? If it must be final as to all parties, that is, as is sometimes said, the whole case

put out of court, then even though Strebel had made his motion for nonsuit and the same been granted and thus the appeal final as between plaintiff and all defendants, it would not yet have been final because the issues raised by the cross-complaint were not settled.

We set down hereunder several expressions taken from the cases which are supposed to state the test of finality for purposes of appeal. Abstract expressions of the law are the result of synthetic processes of reasoning. Exceptions to the rules occur because the generalization is derived from too few particular cases—discovered when a new particular case falls outside of the rule. The greater the number of concretes from which the abstract is derived, the more accurate is likely to be the abstract. Sometimes the exceptions are so many that not much is gained by attempts to formulate an abstract rule.

In *State ex rel. Neilson* v. *Third Jud. Dist. Court*, 36 Utah 223, 102 P. 868, 869, it was stated:

"It is settled law of this jurisdiction that a judgment is final for the purpose of taking an appeal when it terminates the action or proceeding in which it is rendered, and that, too, regardless of whether or not the rights of the parties with reference to the subject-matter of the action have been adjudicated."

In *Honerine Min. & Mill. Co.* v. *Tallerday Steel Pipe & Tank Co.*, supra, it was said that it is

"the termination of the particular action which marks the finality of the judgment. A decision which terminates the suit, or puts the case out of court without the adjudication on the merits, is nevertheless, a final judgment."

Can the inverse be true, that there may be appealable judgments when the case is not put out of court, but it is decided in favor of *some* parties on the merits? Mr. Justice Frick in the case of *Winnovich* v. *Emery*, 33 Utah 345, 93 P. 988, 991, seemed to think so. He said:

"The test of finality for the purpose of an appeal, therefore, is not necessarily whether the whole matter involved in the action is con-

cluded, but whether the *particular proceeding or action is terminated by the judgment.*" (Italics supplied.)

But by this test the present case would hardly be final as to plaintiff because the particular proceeding in this case it must be supposed would be at least the action by the plaintiff against all the defendants to recover his judgment. This test laid down by Mr. Justice Frick might allow an appeal by plaintiff from a judgment of dismissal as to *all* defendants without awaiting the outcome of the result of the cross-suit. However, it all depends on what is regarded as the "particular proceedings." "Particular proceedings" would seem to refer to a proceeding affecting a garnishee collateral to the main case but closing that proceeding. See *Bristol* v. *Brent,* 35 Utah 213, 99 P. 1000.

In *Oldroyd* v. *McCrea,* 65 Utah 142, 235 P. 580, 588, 40 A. L. R. 230, it was attempted to compile previous expressions into a more comprehensive rule. It was said:

"This court in numerous cases has held that a judgment to be final for purposes of an appeal must dispose of the case as to all of the parties and finally dispose of the subject-matter of the litigation on the merits, or be a termination of the particular proceeding or action, or, as sometimes expressed, the case put out of court," citing the Winnovich and Honerine Cases, supra, and *Watson* v. *Mayberry,* 15 Utah 265, 49 P. 479, and *Standard Steam Laundry* v. *Dole,* 20 Utah 469, 58 P. 1109, 1110.

In the former case it was held that before a motion for a new trial was denied, the judgment was not final. In the latter case it was stated:

"The general rule recognized by the courts of the United States and the courts of most, if not all, of the states, is that no judgment or decree will be regarded as final, within the meaning of the statutes in reference to appeals, unless all the issues of law and of fact necessary to be determined were determined, and the case completely disposed of, so far as the court had power to dispose of it," citing *Eastman* v. *Gurrey,* 14 Utah 169, 46 P. 828; *White* v. *Pease,* 15 Utah 170, 49 P. 416, and the Watson Case, supra.

In the Dole Case the court found that the defendant purchaser at a foreclosure sale should account to the mortgagor's assignee for receipts, definitely decided on certain items which would be part of the account and specified that upon payment of any balance owing the defendant by plaintiff, the "plaintiff may redeem [the property] from the mortgage sale." It was held that this was not a final judgment, the account still having to be made and incorporated as part of the judgment. See 2 R. C. L. 41, § 23, for conflict as to authorities in cases where a judgment for an accounting is rendered but the actual accounting referred. Compare *Wheelwright* v. *Roman,* 50 Utah 10, 165 P. 513. The distinction between those cases where it is held something still remains to be done to make a complete judgment, and those cases where it is held that a judgment is final even though some ministerial function in reference to its execution must be done, becomes in some instances a problem for the metaphysician rather than the lawyer.

In *St. Louis, I. M. & S. R. Co.* v. *Southern Express Co.,* 108 U. S. 24, 2 S. Ct. 6, 8, 27 L. Ed. 638, the test was laid down as follows:

"A decree is final, for the purposes of an appeal to this court, when it terminates the litigation between the parties [to the suit] on the merits of the case, and leaves nothing to be done but to enforce by execution what has been determined."

This test hardly fits a case where the defendants prevail and leaves it still a matter of doubt whether it must terminate as to *all* the parties on the merits.

In a note contained in 80 A. L. R. 1186, the topic of the annotation is entitled, "Judgment or order dismissing action as to one defendant as subject of appeal or error before disposition of the case as against codefendant." The note makes a classification which we think merits more than passing notice and may give us the key to unlock the chamber which contains the distinction between those cases where the judgment was held to be final when dismissed as to one or more

defendants, and those cases where it was held not to be final. The note considers the cases where the interests of the defendants are identical and the cases where the interests are severable. By a careful reading of that note much that might be said in this opinion can be omitted.

This test would appear to take us to the end of our exploration were it not for the difficulty in determining what is meant by "identical" interests and "severable" interests. It would be somewhat of a hardship to a plaintiff if each time his complaint was dismissed as to certain defendants to be compelled to bring an appeal in order to find out what we thought were identical or severable interests of the defendants. He might have to do that in order to prevent his six months from running against what we would determine to have been a final judgment. At least some effort should be made to determine if this distinction between defendants with so-called identical or severable interests furnishes the test as to whether the plaintiff must appeal within six months from the order of dismissal or await the result of the entire controversy and, if so, what are identical and severable interests? It seems to the writer there has been entirely too much tendency of the courts to take refuge in words or abstractions when confronted with such difficulties. Perhaps we are in one of those fields of the law where we must establish the sign posts gradually as each case in the doubtful area presents itself, and thus finally furnish by that means sufficiently definite categories to guide the litigant. However, we shall at this time attempt to see how far we can go in finding more definite rules. In many cases it is not difficult to say that the interests of defendants are identical. A good illustration is the case of *Hohorst* v. *Hamburg-American Packet Co.*, 148 U. S. 262, 13 S. Ct. 590, 37 L. Ed. 443, where all of the defendants were accused of "conspiracy and participation of said acts of infringement" and where all would, therefore, be subject to the *same* judgment for infringement and all were sought to be held for the *same acts or omissions* charged as the basis

of their liability. Thus, also where one is sought to be charged for negligence of his agent, which agent is joined in the suit. In such cases there is an *identical* act or omission as the basis of liability; the principal being charged with the act or omission of his agent. The liability of both is derived, if at all, from the *same* acts or omissions, and from which there might be judgment against both but there could be only one satisfaction. Thus, too, in the case of *Shurtz* v. *Thorley,* 90 Utah 381, 61 P. (2d) 1262, 1266, where both defendants were sought to be charged for the breach of a lease, one because he was a party and the other on the theory that the lease was made for him as the principal. It was there said that they were "jointly charged." Such language often used must not be confused with the old common-law doctrine of joint liability of contract where all were a unit and all had to be summoned or none would need to defend and judgment had to be against all or it could be had against none, although execution could go against any after judgment. Certainly, where two are jointly charged with a tort in most cases one may be exonerated and the other held. Joint liability on a contract or note and joint liability for a tort were different things because a joint contract was one where a group as a unit was the obligee or obligor, whereas in tort there is no possibility of agreeing to such an arrangement. Consequently, jointly charged or jointly liable in tort may have a different connotation than in contract even under a code which has largely made joint obligors, joint and several at least as far as procedure is concerned. But in the above cases cited we have perhaps fair examples of identity of interest, and generally if the test is correct the plaintiff in such case could not appeal until the case was tried as to the remaining defendants.

However, let us change the situation in negligence a little, taking an actual case. In the case of *Rocca* v. *Steinmetz,* 189 Cal. 426, 208 P. 964, 965, similar in fact to one of our own, *Reid* v. *Owens,* 69 P. (2d) 265, the action was brought against the father and son; against the latter on the basis of

having by negligence injured plaintiff, a guest passenger; against the former on the basis of permitting his car to be used by a son whom he knew was a reckless driver. Here there might have been judgments against two defendants in favor of plaintiff because two were alleged to be proximately liable for his injury but only one satisfaction. But the basis of liability is not identical as in the supposed cases above set out; and judgment could be rendered against the son and not the father but not against the father and in favor of the son. The action was dismissed as to the father and the son held for trial. The plaintiff appealed from the judgment of dismissal. The court held this judgment a final one because it said a several judgment was proper. But is not any judgment in tort several in that it may be had against one and not others? The court in its opinion, after a consideration of the case of *Nolan* v. *Smith*, 137 Cal. 360, 70 P. 166, stated that the court in that case had overlooked the provision in the California Code (Code Civ. Proc. § 579) which reads like ours as follows:

"In an action against several defendants, the court may, in its discretion, render judgment against one or more of them, leaving the action to proceed against the others, whenever a several judgment is proper."

The court seemed to infer that this section of the Code implies the right of appeal while proceeding against the others. We cannot see that this section of the Code has any implication as to the right of appeal while the litigation against the remaining defendants proceeds. In the first place, the section did not provide for the case of rendering a judgment in *favor* of one of the defendants, but only in case of a judgment *against* one or more. In the second place, there is no implication of a right of the plaintiff to appeal as to judgment in *favor* of one or more defendants when the suit still continues as against remaining defendants. As we shall attempt later to show, the test of a several judgment as final for appeal purposes is something more than

it may be as used in this section. In this section it may apply to a case in which a nonjoint judgment may be given, that is in a case where judgment may be given against some but not all of the defendants, whereas a several judgment which is appealable is one which cannot affect nor can it be affected by the results of an appeal from it or by the results of an appeal from the other judgments. The court said:

"The Code expressly allows it [the judgment of dismissal against Steinmetz, Sr.] and to hold that the person bound to wait until the final judgment against the other party before taking an appeal from the judgment against the first party already rendered is wholly unreasonable, and finds no warrant in any provision of the Code."

We can sympathize with the view that it might be a hardship for the plaintiff to wait until judgment as to the remaining defendant is rendered, but might it not be equally a hardship if the judgment as to the dismissed defendant were reversed and the case tried over again if judgment finally went against the son? Therefore, should it not be part of the general policy of the law to require the plaintiff to wait until he knew what the judgment against the son would be? The plaintiff may have certain advantages in having father and son tried together. The father would then be a party, and a party testifying might be of some advantage as to credibility as compared to his testifying as a nonparty witness. One is tempted to ask, furthermore, what would happen in various outcomes as to the son in one court and the father in the appellate court? If the son lost and dismissal of the father was affirmed, the father would be totally out of the case. No difficulty there. But if the case were reversed as to the father and the son lost, then could the plaintiff elect to continue with the father separately? It would seem if the case could go on under the Code as to the son with the father dismissed, it should be permitted to proceed alone with the father where there was a judgment against the son. Of course, under the Code provision above set out, the court at its discretion could hold the action against the

father in abeyance until it was determined how the son's appeal came out, but would not this be just as much "wholly unreasonable" as requiring the father to wait in order to take his appeal until the trial as to the son was determined? And suppose the case proceeded against the father separately after reversal and he lost and the son appealed and it was reversed as to him. Then it would stand that there was a judgment against the father but none against the son; but the father's liability depends upon the liability of the son. Thus, if the judgment dismissing the father were reversed and the son won, the father would, if this judgment in favor of the son stood, again have to be dismissed. Then the judgment dismissing the second time as to the father and the judgment in favor of the son could go up together or the court might in its discretion refuse to dismiss as to the father until the result of the appeal from the judgment in favor of the son was determined.

We have gone into these situations in some detail because it shows the difficulties which arise by permitting a case to be taken up piecemeal. We do not know whether there was taken into consideration all these possible situations in the Rocca Case. It was the possibility of such outcomes which caused the writer to say in his concurring opinion in the Shurtz Case:

"In this case, if the remaining defendant William R. Thorley obtains a judgment favorable to him on the question as to whether there has been any breach of the contract, the judgment dismissing the cause as to Thomas A. Thorley would not be prejudicial. Consequently, as long as the present status of the plaintiff can be affected by what may happen in the cause between him and William R. Thorley, the judgment of dismissal in favor of Thomas A. Thorley cannot be *final as to the plaintiff*. This is not the case where a dismissal of the cause as to one party cannot in any manner be affected by the result of the case as to the remaining parties as mentioned in the second exception contained in the excerpt from American Jurisprudence cited in the opinion of the court."

The writer has grave doubt as to the correctness of the Rocca decision. The judgment there rendered in favor of

the father was not a severable judgment as could attain finality for appeal purposes. And certainly the Rocca Case seems to go in the face of all of the tests which we have quoted from the Utah cases.

In the case of *McGill* v. *Commercial Union Assur. Co.* (C. C. A.) 5 F. (2d) 589, 591, we have a better example of a severable judgment as meant for purposes of appeal. In that case two insurance companies were sued. It was a question as to whether the policies of the second company supplanted those of the first company before the fire. The first company practically admitted that if they did not, it was liable; but if they did, the other company and not it was liable. Either one or the other must, but not both could, be liable. When the court dismissed the action against the second company it was by implication a judgment against the first company. An appeal by the first company was in effect an appeal from a judgment against it and in favor of the other defendant *on its cross-bill*. The plaintiff was really not interested in whether the first or second company paid as long as he got his money. But quaere: If plaintiff had appealed from the judgment dismissing the second company, would it have been final? Might not he have to wait to see if he did not get judgment against the first company? The court said:

"The case falls clearly under *Hill* v. *Chicago, etc., R. R. Co.*, 140 U. S. 52, 11 S. Ct. 690, 35 L. Ed. 331, as distinguished from *National Bank of Rondout* v. *Smith*, 156 U. S. 330, 15 S. Ct. 358, 39 L. Ed. 441."

We have carefully examined both of those cases. Insufficient facts are given to critically comment on the Hill Case. But the court said in that case:

"But there was no adjudication as to the payment of the amount to be ascertained by the master. That remained unsettled. It was, however, a severable matter from the other subjects of controversy, *and did not affect their determination*. The fact that it was not disposed of did not change the finality of the decree as to the defendants against whom the bill was dismissed. That amount, or to whom, made

payable, did not concern them. They were no longer parties to the suit for any purpose."

The interest of such defendant or defendants discharged must be in the nature of a collateral interest as related to that of the other defendants. Thus, in *Bristol* v. *Brent,* 35 Utah 213, 99 P. 1000, 1001, the discharge of the garnishee could not affect the main controversy. In the Hill Case, apparently, the amount found by the master might affect what the other parties would receive or which parties would receive it, but it could not affect the rights or liabilities on which the remainder of the controversy depended. In the Brent Case the outcome of the garnishee action could not affect the determination of the subjects of controversy in the main suit. Mr. Chief Justice Straup, speaking for the court in the Brent Case, said: "No continued or subsequent proceedings in the district court between the plaintiff and Brent in the main action could in any wise affect the garnishee in the premises." The Massachusetts court in *Reynolds* v. *Missouri, K. & T. Ry. Co.,* 224 Mass. 253, 112 N. E. 859, held likewise.

We do not pretend to lay down a completely comprehensive definition or test of what constitutes such a severable interest in a suit as to make such judgment of dismissal final as to the plaintiff and such defendant for purposes of appeal. But it seems that in order to be severable, and therefore appealable, any determination of the issues so settled by the judgment of dismissal must not affect the determination of the remaining issues whether such judgment on appeal is reversed or affirmed, nor may the determination of the issues remaining affect the final determination of the issues between plantiff and the dismissed defendant. If the determination of the issues relating to the dismissed defendant will or may affect the determination of the remaining issues, the judgment of dismissal is not appealable. Perhaps another way of saying it would be that the judgment is severable when the original determina-

tion of those issues by the trial court and reflected in the judgment or any determination which could be made as the result of an appeal cannot affect the determination of the remaining issues of the suit, nor can the determination of such remaining issues affect the issues between plaintiff and the dismissed defendants if such defendants are restored to the case by a reversal.

It seems to us that, unless the term "identity of interests," is defined, it does not much aid as a test, but the test rather is whether the determination of the issues as to any defendant depends on or affects the determination of the issues as to the other defendants. If "identical interests" means that each defendant has the identical interest in defeating the judgment sought even though not the identical basis, of liability, this may or may not be the test of a severable judgment. But we believe that in all such cases it will be found that issues as to each defendant are so connected or interlocked that the determination as to one set will affect the determination of the other set. In the Rocca Case the bases of liability or issues were not identical, yet the determination of the father's liability somewhat depended on the outcome of the issues as to the son. If the claimed basis of liability of the dismissed defendants is connected with or so related to the claimed basis of liability of the remaining defendants so that one may affect the other, a judgment as to the discharged defendants is not appealable until the issues as to the remaining defendants are settled.

We shall attempt to test the instant case according to these principles. Is the judgment of dismissal as to the Starlene and the Pomeroys a severable judgment for purposes of appeal? In order to make the tests suggested, we find it necessary to anticipate what could be the possible outcomes against the Pomeroys and Starlene if we reversed the case and how any of those outcomes might affect the issues between plaintiff and the White Star. In other words, we are compelled at this time, in order to see if a reversal of this judgment would affect the remaining issues

or be affected by them, to explore the possible outcomes of this case on the supposition that we reverse this judgment. A plaintiff whose complaint has been dismissed as to one or more defendants must, in order to know whether he has a judgment from which he can appeal without awaiting the outcome as to the remaining defendants, pursue this process: He must ask himself how, if the dismissed defendants were restored as defendants in his complaint, the determination of the issues under any tenable theory of the complaint might affect the issues between him and the remaining defendants or be affected by such issues.

In order to make this test we must consider the effect on the remaining issues of any possible judgment under any theory reflected in the complaint, which means that we must list the different theories and see how an acceptance of any one of them under sustaining evidence will or might affect the issues as to the remaining defendants or be affected by them. Without, at this time, going to the evidence to see which of the theories reflected in the complaint can be sustained, but listing the theories only as shown by the allegations of the complaint, we find them as follows:

Theory 1. That the White Star was a corporation distinct from the Pomeroys; that it purchased the gasoline; was therefore a distributor under the statute and therefore liable under the statute; that the Pomeroys through their control wrongly abstracted its assets; and that this is a suit for judgment for the tax and to pursue the assets to collect it. In this theory we do not consider the question of whether a nonjudgment creditor can in such suit pursue assets. That is a separate question. Under this theory the White Star, having only the statutory liability, the one year statute would be a bar and the case was properly dismissed as to defendants Pomeroy and Starlene because, as the lower court held in its opinion, these defendants under this theory would only be held to account if the White Star could be held. Their liability is one to account on the theory that plaintiff can get a judgment against the White Star. He, failing

in that, cannot pursue the assets into the hands of the Pomeroys.

Theory 2. That the Pomeroys were in reality the White Star; that they did their business under its name and that they were therefore in reality both the purchasers of the gasoline and the retailers; and that, therefore, they were not only liable as a debtor by the terms of the act but that there was another and independent liability by reason of the fact that they actually collected the tax from the consumer and received it for the benefit of the State. In such case the four-year statute, instead of the one-year statute, would apply, to the cause of action for money had and received.

Theory 3. That the White Star purchased the gasoline as such and upon importation became liable for the tax and that as to such liability the one-year statute applied. That when the Pomeroys purchased from the White Star, the purchase price they paid the White Star included the tax, and therefore there was an action for moneys actually received by the White Star for the use of the State which was not outlawed for four years; that to collect this debt arising, not by virtue of the statute, but because of a duty to turn over moneys collected and which could be sued for even though the statute were repealed after the tax had been received. This theory does not depend on the distributor or retailer being considered an agent to collect the tax, as was vigorously contended for by plaintiff in his motion to strike the Pomeroys' amendments to their answer and in the reply to said amended answer. The trial court in its opinion correctly held that the gasoline tax law did not make the distributor or retailer an agent. The liability of a distributor or retailer to pay the tax under chapter 12, title 57, R. S. Utah 1933, 57-12-1 et seq. is one which does not depend upon whether or not he has collected the tax. It is a statutory liability and, if any statute of limitations applies against the state, it is the one-year statute, section 104-2-26. But, where one has collected the tax for the state separately or as included in the sale price, such person holds money

had and received for the state. A new element is introduced. A new cause of action arises for failure to turn it over to the state and the four-year statute applies. The theory of this liability depends on the accomplished fact that the person liable for the tax as a debtor under the statute has actually collected it and has had it in his possession for the benefit of the State. The difficulty with this theory is that it is hard to prove that the retailer who purchased from the wholesaler or distributor actually included said tax in his payment. But it seems that where the retailer buys from a distributor with whom he has no connection, a fairly good argument to the effect that he must have included it in the payment can be made out. Let us pause for a moment to develop it. The gasoline tax law levies the tax on the sale or use of motor fuels sold in this State. Therefore, the tax is on the sale or use. Theoretically the tax may therefore be chargeable against the consumer who uses it. There is no provision for collecting it from him. There is a provision making it payable by the distributor or retailer within 15 days after the month in which it was sold or used. We are not now disposed to go into refinements of interpretation of this act, and what we here say may be subject to revision in a case when the matter directly arises. But if the retailer actually collects the tax from the consumer, it would seem that he might be held for it on the basis of his having received it. But he is exonerated when his distributor has paid the tax on it. And if he has turned it over to his distributor in advance in the sale price, it would seem that he could hardly be held for it by the state even though his distributor failed to pay the State. The distributor could be held even though he never collected the tax from the retailer, and in such case perhaps the retailer could be held because the statute also makes it his duty to pay and he exonerates himself by showing payment by the distributor or payment by him to the distributor. The upshot of all this may be that where a retailer dealing with a distributor with whom he is not connected, collects from the consumer, it is presumed the sale

price to the distributor contains the tax just as it is presumed that the consumer who purchased from the retailer paid his tax on the use included in that purchase price.

If this presumption is a valid one, the same presumption perhaps may be indulged in regard to the payments of the Pomeroys to the White Star, in which case the latter would have actually received the tax, and under such presumption an action for moneys had and received be sustained against it independently of the theory of making it the alter ego of the Pomeroys. The allegations of the complaint can be made, we think, even to reflect this theory. In such case the White Star would be liable first as a distributor, regardless of whether it had received the tax, which liability would have been outlawed in one year, and, secondly, as one who had actually received the tax for the benefit of the State, which liability to hand it over would not be outlawed until four years after the tax was received.

Theory 4. That the White Star was not only the purchaser and importer but also the retailer who sold to the consumer, and that the Pomeroys were its alter ego. While the allegations would be susceptible of such construction, as before stated, we do not think this theory seriously urged and shall no longer discuss it.

We have set out these theories at this time, not for the purpose of deciding the merits of the appeal, but for the purpose of ascertaining whether a determination under any of the theories of the issues as to the dismissed defendants would affect or be affected by the issues between plaintiff and Strebel, the remaining defendant. That we shall now ascertain.

The case is somewhat peculiar. The plaintiff and Strebel, the receiver, are really arrayed against the Starlene and the Pomeroys in most of the issues. While it it true that the plaintiff's complaint has at least three theories on which recovery is based, they are common to the issues raised by Strebel against the other defendants. The only defense which Strebel has against the plaintiff is the one-year stat-

ute of limitations. He does not dispute plaintiff's claim, but insists only that the latter be put to his proof. Strebel in his pleadings adopts the allegations of the complaint. They tried the affirmative part of plaintiff's case and Strebel's cross-suit together. It was stipulated on the second day of the trial that, "except where the record otherwise indicated, all evidence offered by plaintiff would be received on behalf of defendant Strebel in support of his cross-complaint," and that evidence in support of Strebel's cross-complaint would be received in support of plaintiff's complaint. Objections made on behalf of one would be considered as made on behalf of the other. Except as to the statute of limitations set up by Strebel against plaintiff, they were in reality coplaintiffs against the defendants Starlene and Pomeroys. They were both trying to recover property from these defendants for the benefit of satisfying their respective claims. Strebel had not made a motion for nonsuit on his plea of the statute of limitations. But all the evidence that revealed the one year as having run against plaintiff in favor of the White Star as to all tax claims sued on was in. The court could have, perhaps on its own motion upon the theory which it adopted, rendered judgment against the plaintiff in favor of the White Star. Unless Strebel withdraws this plea, the court must in adjudicating the issues after all the evidence is in, on its present view of this case, dismiss the complaint as against Strebel. Thus will the plaintiff be completely out of court by judgment as he is now in reality and effect. But as far as Starlene and the Pomeroys are concerned, Strebel is a plaintiff.

We now take up Theory 1, which was the theory on which the court dismissed defendants from plaintiff's complaint. We shall attempt to ascertain whether under this theory the issues between the remaining defendant Strebel and plaintiff, or between Strebel and the other defendants, can be disturbed by or can disturb the issues between plaintiff and the discharged defendants. The answer is contained in what we have previously said. If

the one-year statute is a good defense, this judgment of dismissal is in effect a final one, because the issues between plaintiff and Strebel are already determined by the law applied by the lower court to the defendants who moved to dismiss. If we hold that ruling correct, Strebel stands as if already dismissed as to plaintiff and as the real plaintiff against the other defendants. The ruling of the lower court determining that these defendants could not be held could not affect Strebel's rights against them, and it could not affect the issues between plaintiff and Strebel, because such ruling already made the law which would be applicable on the issues between plaintiff and Strebel when the latter was to make his motion to dismiss.

Could a reversal by this court restoring the dismissed defendants to the case as to the plaintiff under Theory 2, and a determination by the lower court in accordance therewith, affect the issues between Strebel and plaintiff? Under this theory the one-year statute would still apply to the White Star because the plaintiff could treat it as a distributor who owed the duty to pay the tax under the statute. But looked at from the standpoint of the Pomeroys operating for themselves under the name of the White Star, the plaintiff could also treat the suit as one against the Pomeroys because at the same time they operated under the name White Star they, as retailers, received the tax and therefore made the White Star not only the distributor with a statutory liability but also the receiver of the tax, it being an alter ego of the Pomeroys. And in this later case the four-year statute would apply as against an action for money had and received for the use of the State. So under this theory, the issues would stand as they now are between Strebel and plaintiff even though it were determined that the Pomeroys, using the name of the White Star, were liable under the theory of money received for the State's benefit and that claim not outlawed for four years. Furthermore, such ruling could not affect any of the issues in the cross-suit between Strebel and the other defendants. So

under Theory 2, whether the one-year or four-year statute is applicable, the judgment must be considered as severable and final for purposes of appeal.

How stands it as to Theory 3? Under Theory 3 the White Star would be liable for moneys had and received to the use of the State and could not obtain a dismissal of the complaint as to itself on the one-year statute. Under this theory it is doubtful whether the Pomeroys could be held for money had and received as well as the White Star. Under the assumptions heretofore superficially made as to the way the gasoline tax law would be applied, perhaps one or the other could only be held as having received the moneys for the benefit of the State. However, the holding of one exonerates the other under that theory. But the question still remains as to whether property alleged to have been wrongly taken by the White Star might not be pursued into the hands of the Pomeroys in order to collect a judgment obtained against the White Star based on the theory of moneys received to the use of the State.

But what stands out clearly is that under Theory 3 the determination of the issues in accordance therewith *would affect the determination of the issues between the plaintiff and the White Star*, in that the latter could not then plead out plaintiff on the one-year statute. So technically the rule of *Shurtz* v. *Thorley*, supra, applies this being the general rule unless several judgments can be given. And should the evidence support one of the theories which the complaint reflects and the court so find, there would not be a severable judgment according to the tests laid down in this opinion.

We shall, nevertheless, not dismiss this appeal. Earlier in this opinion we held that our jurisdiction of appeals did not depend on the appealed judgment being final; that the North Point Case was dicta as to that. We shall now see clearer the materiality of that holding in this case.

The principle that only final judgments are appealable rests upon a salutary policy of the law of ancient origin. Cases cannot be brought up in parcels. But it being a policy of the law, it is not inflexible and should not be invoked where injustice or hardship would result. The very struggle to get away from the inexorability of the rule has led to various exceptions. Illinois, which has adhered to the general rule, created an exception where to deny the appeal would amount to great hardship or a denial of justice. See note, 80 A. L. R. 1192. Likewise, some of the attempted distinctions between severable and identical interests of defendants comes from a desire to escape the inexorability of the rule.

Most all of the abstract statements of the rule state that it is "generally" held that a judgment of dismissal as to one defendant is not final until the case has been disposed of as to all parties. 2 Am. Jur., Appeal & Error, § 27, p. 866, which, after stating the general rule says:

"Some courts, while adhering to the general rule, have also created an exception to it and have held that where to deny an appeal or writ of error would amount to a denial of justice or where great hardship would result from refusing to entertain such appeal or writ of error, such appeal or writ of error will be allowed even though the judgment or decree of the lower court did not dispose of the cause as to all parties and was not final."

The case of *Ketchum Coal Co.* v. *Pleasant Valley Coal Co.*, 50 Utah 395, 168 P. 86, 88, affords another illustration of an escape from the rigors of the rule of ██ *Lowell* v. *Parkinson,* 2 Utah 370, and *Shurtz* v. *Thorley,* supra. It was said in the Ketchum Coal Case:

"True, we said in the former [opinion of this] case that to constitute a final judgment the case must be determined as to all parties. That language is, however, used and must be considered in the light of the issues there presented and in connection with all that was said. We also there said that the cases cannot be split up and considered piecemeal."

That important policy of the law that cases cannot be appealed piecemeal is subject to a still more paramount principle, and that is that injustice and hardship must be avoided whenever possible. In this case if we dismissed this appeal it would result in a duplication of the remainder of this trial if plaintiff would finally obtain a reversal. The rule is not so inflexible that we cannot retain the appeal when we can, by expressing an opinion on the matter appealed from, save that double trial. It is a discretion and exception rarely to be used, but we think this is one of the times when we should make an exception to the general rule.

The law should be made to serve justice, not to defeat it. In the instant case the lower court has continued the case until this appeal is decided. The appeal has been at considerable expense. There is a big record. As may be judged from this opinion, the points on which the question of the appealability turn are somewhat refined. We have been compelled in our determination of whether there was an appealable judgment to go rather far into what would have had to be considered if the merits were before us. The economy of the situation requires a relaxation of the rule. Had the plaintiff not brought this appeal, he would have run the risk of this court taking a different view, in which case his time for appeal would have run. He was between the devil and the deep sea. But there is still another reason for retaining the case. The case is to all intents and purposes entirely dismissed as to all defendants. Strebel is evidently simply waiting until the court automatically pronounces judgment of dismissal in his favor after all the evidence is in. This the court, under the view it took, would have to do. In fact, we see no reason why the court could not have done it sua sponte. All the evidence that a year had run from all the times when all the taxes were due was in. Unless Strebel would withdraw the defense, the court would have been bound to grant judgment of dismissal as its judgment on one of the issues under the view it took. For all intents and purposes it is as if the case had been dismissed

as to all defendants and plaintiff was completely out of court. The decision is in the nature of a final decision. "In order that a judgment, decree or order may be appealed from, it may be stated generally that the decision must be final or in the *nature* of a final decision." 2 R. C. L. 39, § 21. We do not think that the plaintiff need wait his appeal until the cross-suit is tried. While the issues between Strebel and the other defendants do not cover as great a range as those between plaintiff and those defendants, the same evidence on part of defendants would be applicable to the issues between them and plaintiff as between them and Strebel. If this appeal is dismissed, plaintiff must, as said before, wait on the sidelines until he is put out of court altogether and then bring up all the record, and if it is reversed, all the evidence on the part of plaintiff might have to be reintroduced. Since we have determined that our jurisdiction of appeals does not depend on the finality of judgments, but that our refusal to entertain appeals from other than final judgments rests upon a sound and ancient policy of the law, we are free in this case to relax the rule and to retain this appeal. Doing so, we now proceed with the questions raised by the appeal.

Much of the analysis has already been made. We have uncovered the various theories of liability of the defendants as raised by the allegations of the complaint. We did not go into the evidence to see which of the theories could be supported by the evidence. Nor are we inclined to do so for the reason which follows. The lower court dismissed the complaint as to the Starlene and Pomeroys on the theory that the obligation of the White Star was one created by statute; that the said White Star was not an agent to collect the tax; and that therefore the one-year statute applied, and since the liability of the Pomeroys depended on the liability of the White Star, it must be dismissed as to the Pomeroys and Starlene. The court's ruling was correct on the theory which it applied. But from the opinion of the court contained in defendants' brief, it does not appear that it con-

sidered the other theories contained in the complaint. Perhaps the court believed that the evidence was not sufficient to sustain such other theories. Perhaps it was because in plaintiff's motion to strike the amendment of Pomeroys and Starlene to their answer and the reply of plaintiff to said answer, he stressed money had and received by reason of agency, stressing the agency theory which, as the court held, was not tenable, instead of the theory of which the allegations of the complaint are susceptible, to wit, that there was an actual receipt of moneys by either the Pomeroys and/or White Star although no agency existed as set out in Theories 2 and 3, above. This is different from the agency theory.

A party who imports the gas for sale, and at the same time receives the tax from the public, has obtained actual money which it is his duty to turn over to the State. This is an obligation distinct from that of his statutory obligation to pay the tax because the gas is to be used or sold. In the latter case, the tax is collected from him at the source. The statute makes him liable for it. But if he actually collects the tax from the retailer or consumer, he would unjustly enrich himself by being permitted to retain moneys paid by another for the use and benefit of the State. This is not the theory of agency, but depends on a principle more ultimate, i. e., that no one shall be permitted to enrich himself by retaining moneys due another. And whether the money is received by the White Star from Pomeroys as retailers (Theory 3), or whether it was received by the Pomeroys from the customers and the White Star is the Pomeroys (Theory 2), would simply show the application of this ultimate principle under two different theories. We think that we should definitely have from the lower court a finding on these other theories before we review the evidence. To now review several thousand pages of evidence, to see which theory or theories are sustainable by the evidence, without the assistance of the lower court or any from counsel, puts upon us an unwarranted burden. The briefs of the appellant do not discuss any of the theories

herein set out. There was some general oral argument about some of them. The brief of appellant, oddly enough, never mentions any of these theories. The various assignments of error really center on the one ruling of the court dismissing the complaint as to the three defendants, but the reasons stated why the court erred do not include any discussion of the theories expounded in this opinion. The brief states that the particular questions involved for determination are:

"I. The Claims sued on were not barred by the statutes pleaded.

"II. The statutes of limitations were not pleaded as required by law.

"III. Respondents' pleas of the statute of limitations were not timely.

"IV. Having failed to file reports disclosing the number of gallons of gasoline sold during the months of October, November and December, 1932, as required by law, the respondents cannot be heard to plead the statute of limitations.

"V. Respondents in writing signed by them, acknowledged the claims sued on."

But in the treatment of the first question it is not contended that under the evidence and theories of the complaint, the four-year statute (R. S. Utah 1933, 104-2-23) and not the one-year applied. It is contended that sections 104-2-20 and 104-2-26, R. S. Utah 1933, pleaded by defendants, did not come into force until the year under the former statute had partly run. The date of accrual of the cause of action for failure to pay the taxes on December, 1932, sales, the latest one to accrue, was February 1, 1933. Therefore, on February 1, 1934, the year would have run. This action was not brought until April 14, 1934. The Revised Statutes of 1933 went into effect June 26, 1933. It is therefore argued that there was a repeal of section 6468, Comp. Laws 1917, before the year had run and the coming into force of sections 104-2-20 and 104-2-26, R. S. 1933, which were pleaded by defendants. Thus, argues plaintiff, the year which defendants plead as a bar under the statutes designated by them in their answer must run from the time these sections were operative, to

wit, from June 26, 1933, which makes the year in which the suit must be filed expire by June 26, 1934. This suit being filed on April 14, 1934, was filed within that period. But appellant ignores the effect of sections 88-1-6 and 88-2-6, R. S. 1933. The latter section made the 1933 Code a continuation of the provisions contained in existing laws as far as they were the same. The Revised Statutes as to such provisions were not a repeal and a substitution but a re-affirmation of such existing provisions. The first contention of appellant is therefore not tenable.

The appellant's next contention is that the statutes were not pleaded as required by law because the specific subsection of section 104-2-26 was not set out as required by section 104-13-7. This question was raised for the first time in this court. The motion to strike the amendment or the reply to the amendment did not mention it. We shall not, therefore, now consider it except to say that the only part of section 104-2-26 which could apply to the allegations of the complaint is subsection (1). No one could have been misled as to what part of section 104-2-26 the defendants relied on. *St. Paul Title & Trust Co.* v. *Stensgaard*, 162 Cal. 178, 179, 121 P. 731, 39 L. R. A. (N. S.) 741.

The next question the appellant's brief discloses for determination is that the statutes of limitation were not timely pleaded and the court abused its discretion in permitting the amendment. We have already in this opinion held otherwise.

The next question which appellant submits for determination is as to whether the failure of the White Star and the Pomeroys to file the reports of sales of gasoline for the months of October, November, and December, 1932, was not such a concealment of the cause of action as to postpone the running of the statute. There seems to be no doubt that if this were an action of fraud, the statute would not begin to run until the fraud was discovered or reasonably could have been discovered. But even when the action is not based on fraud, in equity where the cause of action is concealed from the one in whom it resides by the

one against whom it lies, the statute will be postponed. In 37 C. J. 973 it is said that by the weight of authority the same rule applies in a case at law. The lower court held in its opinion that the failure to file the reports as required by statute was not such concealment as would postpone the statute. In the case of *Riley* v. *Howard,* 193 Cal. 522, 226 P. 393, it was held that failure to set in motion the machinery of the Inheritance Tax Act or in any wise to conform to its requirements stripped the trustees liable for it of the protection of the statute of limitations. The cases are not exactly parallel, because in the Riley Case there was no way for the State to discover the situation on which an inheritance tax attached, whereas in the case at bar the reports of the railroad company would have informed the Secretary of State of the fact that the White Star had imported gasoline. The subject however, is one which might with profit be further pursued for the purpose of determining whether the concealment must be an active one or whether the failure to do those very things which were intended to put the tax authorities on notice would be sufficient concealment. There is something to be said for the latter view. Because of the disposition of this appeal made hereunder, which may result by rulings in the lower court in the elimination of this question, and because the briefs on either side do not adequately advise us regarding this matter, we shall leave it in abeyance to be considered if the record again comes up, and the question is raised and adequately discussed.

The next and last question presented by appellant for determination is that respondents in writing signed by them acknowledged the claims sued on. The signed acknowledgment claimed is the answer of the White Star acknowledging that they owed the debt. There is nothing in this contention. It is questionable whether the acknowledgment in writing, which by section 104-2-45, R. S. 1933, will extend the period, applies to any liability, debt, or claim other than one founded on contract, and this obligation to pay the tax is not one founded on contract. But even

though it need not be an obligation founded on contract, the acknowledgment must be made before the statute has run and the same pleaded to show the tolling of the statute, or, if made after the statute has run so as to revive the debt as against the statute, such acknowledgment must be pleaded as a basis of the action. Nor does it meet the test contained on page 522 of 75 Utah 498 in the report of the case of *Weir* v. *Bauer*, 286 P. 936. So this contention must fail.

These five questions posed for answer constitute the arguments in appellant's briefs. The theory of money had for the benefit of the State, which cause would not be barred for four years, was argued orally but was not contained except in the most incidental manner in the briefs of either side. Perhaps we should infer from the judgment of the lower court that, finding the one-year statute applicable, it accepted Theory 1 and must have found against Theories 2 and 3, but the opinion of the lower court does not disclose that it considered either of those theories. We are disinclined to review more than three thousand pages of testimony without any definite assurance that the lower court took these theories into consideration or without aid of counsel in segregating and pointing out the evidence which it is claimed would support these theories or make against them, in order to determine those questions on first instance.

We, therefore, shall return the record to the lower court, with instructions either (a) at its discretion to set aside the judgments dismissing as to the defendants and hear the whole case and then rule on Theories 1, 2, and 3, or (b) consider the evidence already before it and rule and find on said theories. When that it done and if the lower court comes to the same conclusion, to wit, that under the evidence only Theory 1 can be sustained and the one-year statute therefore applies, we will review such rulings calling on counsel to discuss the evidence in the light of such rulings.

As to costs, we shall award plaintiff costs of filing this appeal and costs of printing his briefs; but costs as to the transcript and printing the abstract must abide the final

event. Such transcript and abstract as now printed may be used in the return of the case to this court if it is again brought up. Such transcript and much of the abstract belong more properly to an appeal from the rulings on the suggested questions.

Such is the order.

FOLLAND, C. J., and HANSON, J., concur.

LARSON, Justice (concurring).

I concur in the solution arrived at by Mr. Justice WOLFE and in the order made. I have doubt, however, that the statute of limitations can run against the State in a tax case. I do not think that section 104-2-31, R. S. Utah 1933, has such effect. It is apparent that article 3 of chapter 2 of title 104 has to do with limitations in actions to enforce civil rights as between private parties. Section 104-2-31 then declares in effect that in actions brought in the name of, or for the benefit of, the State, the limitations shall apply in the same manner as to actions by private parties. I opine that this means that when the State stands in a position where, were it a private party, the statute could be pleaded, it may also be set up against the State. But in those positions where a private party could not be, those matters which involve and go to the very existence or maintenance of the life of the sovereign, the State itself, it may not be met with a plea of limitations. Has the State consented—yea, can the State consent—that an individual may raise the plea against the very existence of the government itself, and by statute of limitations cause the State to die, to cease to exist?

I also doubt that a tax, levied by a statute, as this one, is a "liability created by statute" as that term is used in section 104-2-26, R. S. 1933, being section 6468, Comp. Laws Utah 1917. And assuming that the statute of limitations will run against the State, does it commence to run thirty days from the time the gas is sold or from the date of filing the report showing the sales and the tax due? This question was indi-

cated by Mr. Justice WOLFE and for the reason stated in his opinion properly left unanswered.

Without entering into a discussion of the matter, I call attention to the rather peculiar provisions of section 80-10-1, R. S. 1933, as follows:

> "*Every tax* has the effect of a judgment against the person, and *every lien created by this title* has the force and effect of an execution duly levied against all personal property of the delinquent. The *judgment is not satisfied nor the lien removed until the taxes are paid or the property sold* for the payment thereof."

Since under the opinion of Mr. Justice WOLFE, we make no final rulings on the issues pending the determination by the district court of the questions or matters indicated in that opinion, I make no comment as to the possible effect of the section last quoted on the tax involved in this case, nor do I express an opinion as to whether the statute of limitations could have run in favor of defendants on any theory of the case. I simply raise the questions, so the trial court—should it finally determine that the facts are such that the action must be construed as a straight action to collect a tax under Theory 1 set forth in the opinion of Mr. Justice WOLFE—may make a complete determination of the question as to whether the one year statute of limitations could defeat the action.

MOFFAT, Justice (dissenting).

I dissent. Paragraph 12 of plaintiff's complaint alleges:

> "That under the provisions of chapter 39, Session Laws of Utah 1923, as amended and carried into chapter 12, title 57 of the Revised Statutes of Utah, 1933, there was at all times herein mentioned and is imposed upon the sale and use of all motor vehicle fuels *a tax* of four cents a gallon payable by the distributor or retailer to the State of Utah on or before the 15th day of the next succeeding month after such sale and use;" and "That during the month of October, 1932, the defendants, Jack W. T. Pomeroy and Clara Pomeroy, doing business as the White Star Gas & Oil Company, and White Star Gas & Oil Company, a corporation, sold a net of 87,118 taxable gallons of

motor vehicle fuel upon which there became and is due and owing to the State of Utah *a tax* of $3,484.72;"

and that defendants have failed and refused to pay. (Italics added.)

There are then allegations as to sale or use of gasoline for the months of November and December, further amounts, and that under the statute penalties are imposed with the amounts stated.

Without these allegations, notwithstanding the detailed length of the allegations of the complaint, it does not state a cause of action. Put otherwise in absence of the statute levying the tax and requiring payment thereof, the State has no claim and no cause to complain.

It is admitted the action was not commenced within one year after the tax became due and payable. The plea of the statute of limitations was interposed, it is claimed, tardily; but the court imposed conditions which were met, and the court did not abuse its discretion in permitting the amendment to raise the plea of the statute under the conditions imposed.

With this setting, can it be said that the State has or can have any claim other than because of the statute? The statutes involved are:

"There is hereby levied and imposed an excise tax of four cents per gallon upon the sale or use of all motor fuels sold or used in this state, excepting such motor fuels as are or have been brought into this state and sold in original packages as purely interstate commerce sales. If any motor fuels have been purchased outside of this state and brought into this state in original packages or purchased within the state in original packages from a distributor for the use of the consumer, then such tax shall be imposed upon the use of such fuels. It is the purpose and intent of this chapter to impose and levy said tax upon the sale or use of motor fuels as defined in this chapter whether such fuels are used in motor vehicles or for other purposes, and by whomsoever sold or used, including municipalities, counties, school districts and every other arm or branch of the state government." R. S. Utah 1933, 57-12-5.

"Every distributor of, and retail dealer in, motor fuel shall render to the state tax commission on or before the fifteenth day of each month, on forms prescribed, prepared and furnished by it, a sworn statement of the number of gallons of motor fuel sold or used by him or them during the preceding calendar month, which statement shall be sworn to by one of the principal officers in the case of a domestic corporation or by the resident general agent or attorney in fact in case of a foreign corporation, by the managing agent or owner in case of a firm or association or by a duly elected or appointed officer in charge in case of a municipality or county, board of education or other governmental agency, and shall contain an itemized account of the date and quantities of motor fuel sold or used, stating separately the sales made in interstate commerce and those made in broken packages. Bills shall be rendered to all purchasers of motor fuel by distributors and retail dealers in motor fuel as herein defined." R. S. Utah 1933, 57-12-6.

"If any distributor or retail dealer fails or refuses to pay any tax when the same becomes due, the same shall be delinquent on the first day of the next succeeding month. If not paid before such date, his license to do business shall automatically be revoked and there shall be imposed a penalty of twenty-five per cent of the amount of the tax. The amount of such tax with the penalty shall bear interest at the rate of twelve per cent per annum from the date of delinquency until the same is paid." R. S. Utah 1933, 57-12-10, as amended by chapter 41, Laws of Utah 1933.

"The periods prescribed for the commencement of actions other than for the recovery of real property are as hereinafter provided." R. S. Utah 1933, 104-2-20.

"Within one year:

"(1) An action for liability created by the statutes of a foreign state or by the statutes of this state, other than a penalty or forfeiture under the laws of this state, except where in special cases a different limitation is prescribed by statute.

"(2) An action upon a statute for a penalty or forfeiture where the action is given to an individual, or to an individual and the state, except when the statute imposing it prescribes a different limitation.

"(3) An action upon a statute, or upon an undertaking in a criminal action, for a forfeiture or penalty to the state.

"(4) An action for libel, slander, assault, battery, false imprisonment or seduction.

"(5) An action against a sheriff or other officer for the escape of a prisoner arrested or imprisoned upon either civil or criminal process.

"(6) An action against a municipal corporation for damages or injuries to property caused by a mob or riot." R. S. Utah 1933, 104-2-26.

Under the statute, section 57-12-5, the tax is levied upon the motor vehicle fuel. Under section 57-12-6, "Every distributor of and retail dealer in, motor fuel" shall render statements and make payment. Thus the tax on the sale or use of gasoline is an excise tax assessed by the statute against the distributor to the extent of four cents upon each taxable gallon sold or used by the distributor. "The term 'distributor' is defined as any person who imports or causes to be imported motor fuels, as herein defined, for use, distribution or sale otherwise than in the original packages in which the same was imported, and after the same reaches this state." A "retail dealer" is any person who purchases from a "distributor" within this state any motor fuels in the original packages in which the same is imported for use, distribution, or sale within this state otherwise than in the original packages, or who imports into the state motor fuels in the original packages for use of such person. R. S. Utah 1933, 57-12-1, subds. 3 and 4.

It is alleged in plaintiff's complaint that the "White Star Gas and Oil Company" is a Utah corporation. That the "Starlene Gas & Oil Company" is a Utah corporation. That for a time the "White Star Gas & Oil Company" was operated as a corporation, Jack W. T. Pomeroy as president and W. D. Scogings as vice-president managed and operated the business. That this management continued to July 22, 1929, after which it was managed and operated as a partnership by Pomeroy and Scogings. "That on or about the 22nd day of July, 1929 * * * Jack W. T. Pomeroy, and Clara Pomeroy, his wife, obtained the control of said corporation * * *" That Jack W. T. Pomeroy and Clara Pomeroy, his wife, "operated, maintained and conducted the business of the White Star Gas & Oil Company" as their own. That they operated the "White Star Service Station." That they, Pom-

eroy and wife, sold gasoline to themselves at less than cost. That "Jack W. T. Pomeroy and Clara Pomeroy, doing business as the White Star Gas & Oil Company * * * sold 87,118 taxable gallons of motor fuel," during the month of October, 1932, and during the month of November, 1932, 36,671 taxable gallons, and during the month of December of the same year, 39,894 gallons.

It is then alleged that Jack W. T. Pomeroy and Clara Pomeroy, his wife, doing business as the "White Star Gas & Oil Company, and of the White Star Gas & Oil Company, a corporation, in selling motor vehicle fuels at retail, * * * did actually collect from its retail customers the said four cents per gallon *tax* for the use and benefit of the State of Utah." The amounts of the tax items and penalties and a long course of alleged fraudulent manipulations are alleged.

I see no escape from the position that the action is based entirely upon the statute of the state imposing the tax, and that whether the White Star Gas & Oil Company, or any other agency, and whether a valid independent corporate entity or a trade-name, or alter ego for the Pomeroys, or whether the Pomeroys individually or personally or by any other name, imported the gasoline in question at the times alleged, it is a liability for the payment of a tax under the statute. If the White Star Gas & Oil Company imported and distributed the gas, it is subject to the tax, and if it is a corporation the corporation was liable under the statutes. If the Pomeroys did the same things, they are liable under the statute. They either did the importing themselves or through an agency set up and controlled by them, or an independent operating corporation did it. In any event, the tax became due and payable from the distributor at the time pleaded in the complaint, and such distributor was liable whether he sold the gasoline, gave it away, or used it. To assume that the corporation was an independently operated concern and that it delivered the gas to the Pomeroys or an agency controlled by them, and that they collected the tax for the use and benefit of the State, does violence to the very assumption

upon which the assumption is based. In other words, if the corporation is an independent concern, it is liable as the importer and distributor. If the gasoline were then sold to the Pomeroys in the original packages, they would be retail dealers and subject to the tax. If the corporation or any other Pomeroy agency did the importing, the Pomeroys would be personally liable. In any event, the statute begins to run from the 15th day of the month following the sale or use of the gasoline. R. S. Utah 1933, 57-12-9. It is equally clear that the statute of limitations having been interposed in the cause that the statute applies because it is "an action for liability created by the statutes * * * of this state." Section 104-2-26, subd. 1. And the limitation prescribed is one year for the commencement of such actions.

As to the question as to the finality of the judgment, I agree with the result arrived at by Mr. Justice WOLFE in the prevailing opinion; likewise, as to the disposition of the question of the claim that the statute of limitations was not pleaded as required by law.

The judgment of the trial court should be affirmed.