## GRAHAM v. STREET.

No. 6863. Decided February 15, 1946. (166 P. 2d 524.)

462

See 1 C. J. S., Action, sec. 111; 41 Am. Jur., 501.

*White, Wright & Arnovitz,* of Salt Lake City, for appellants.

*George B. Stanley,* of Heber, for respondent.

WOLFE, Justice.

Appeal from an interlocutory decree and the findings in support of it, holding that a partnership had been formed between plaintiff Graham and defendant Street on August 6, 1943 (in the decree August 6, 1945, but obviously a clerical error) and that Street and Siegel through connivance diverted from plaintiff the use of partnership property and partnership earnings, and ordering an accounting. We entertained the appeal under authority of *Attorney General of Utah* v. *Pomeroy,* 93 Utah 426, 73 P. 2d 1277, 114 A. L. R. 726. The original complaint was only against defendant Street. It alleged a parol contract of partnership for the purpose of acquiring and operating a combination caterpillar tractor, bulldozer and road grader in excavation work and for dividing the profits equally between the parties; that defendant Street wrongully collected money belonging to the partnership and applied the same to other than partnership purposes and withheld from plaintiff all moneys earned. It further alleged defendant impeded and injured the business of said partnership and

*"conspired with other parties to take possession of, and to misappropriate the funds belonging to said partnership, and to exclude this plaintiff from any management or control of said partnership business"* (italics added),

contrary to the agreement heretofore entered into. On April 14, 1945, an amended complaint with Max Siegel joined as a defendant was tendered, and on April 17, 1945, on the morning of the trial, the amended complaint, over objection of Street and Siegel, was permitted to be filed and an order

made joining Siegel as a party defendant. Appellants assign the permission to file the amendment and the joinder of Siegel as errors.

In the amended complaint averments are in considerable more detail than in the original complaint. The event leading up to the dealings with Siegel are set out and the terms of the verbal contract for the joint venture between Graham and Street, which it is claimed reflect the partnership, are enumerated. There then follows allegations of Street's breach of the partnership agreement in failing to deposit partnership moneys in the bank as agreed and in applying said moneys to non-partnership purposes. Thus far the amended complaint sets up no new cause of action against Street but only an elaboration of the transactions which reflect the partnership set out in the original complaint. The amended complaint then proceeds to recite in some detail the transactions which took place with Siegel by which it is alleged that the latter first came into the transaction ostensibly as a lender taking title in himself for security and afterwards repudiated that status and insisted that he was the legal owner of the equipment purchased, whereas he was in fact actually a lender and mortgagee; that later when Siegel repudiated the status of lender and suggested a partnership between Graham, Street and himself in which he, Siegel, would receive back the $4500 which he advanced for the tractor out of the two-thirds of the net earnings accruing to Graham and Street, retaining one-third of the earnings during the time it took to pay off the $4500.00 and interest, each party to end with an ownership of a one-third interest in the equipment and each thereafter to divide the earnings, a third to each; that upon refusal of plaintiff to enter into such arrangement, Siegel notified plaintiff that he was the sole owner of said equipment and denied the existence of a note and mortgage for $4500 claimed by plaintiff to have been executed in his favor at a previous occasion. These matters are new to the amended complaint. While the original complaint contained a vague reference to a conspiracy be-

tween Street and third parties as shown by the above italicized portion, the new matter we think is more than a mere elaboration of this vague charge of conspiracy because it definitely names Siegel as the outside conspiring party and guiding genius of Street in his alleged departure from the conduct expected from one related to another in trust and confidence. The gravamen of the offense is shifted from one in the original complaint of a recalcitrant partner who will not account and who, with the assistance of others, uses partnership property for other than partnership use, to one where the material part of the offense is the defrauding of Graham by the connivance of Street and Siegel in which the partnership of Graham and Street is a preliminary issue. More anent this later. These amendments are well within the principle laid down in the case of *Hartford Accident & Indemnity Co.* v. *Clegg,* 103 Utah 414, 135 P. 2d 919, 925. As noted by Justice Wade in his concurring opinion in that case, our statute, Utah Code 1943, 104-14-4, does not limit the amendments to an area within the cause of action originally pleaded but grants the court power to allow amendments "in the furtherance of justice." While some limit must be placed on amendments allowed, the limits are those set out in *Hartford Accident and Indemnity Co.* v. *Clegg,* supra. It was there held that where the new allegations do not introduce matters which interject an entirely new, distinct and unrelated legal obligation but enlarge on the facts so as to present a series of transactions all germane and forming a connected whole reflecting the manner in which the plaintiff suffered injury, the bounds of an amendment are determined by what

"can [be] conveniently and efficiently [handled] as a single unit * * * without injury to substantive rights."

And this is largely in the discretion of the trial court. Here all the added matter was germane to the original matters alleged. And if the matters between the plaintiff on the one hand and Street and Siegel on the other are

to be adjudicated in this suit by making Siegel a party, the amendments were quite material, if not necessary. The action of the court in permitting the amendments must be considered in connection with its action in ordering Siegel in as a defendant. As the two matters are related we shall therefore pass on to the second error assigned, to wit: the joining of Siegel as a defendant.

Sec. 104-3-25, U. C. A. 1943 provides as far as is here material as follows:

"The court may determine any controversy between the parties before it when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy cannot be had without the presence of other parties, the court must then order them to be brought in.' * * *"

We think the amended complaint, when the history of the transactions somewhat narratively stated is considered, sets forth an action in equity, the very core of which is the fraudulent action of the defendants Street and Siegel in conniving to undo a partnership between Graham and Street and to keep from Graham the property and fruits of his alleged partnership with Street. The allegations of plaintiff's partnership with Street are necessary and preliminary to arrive at the part that Siegel and Street played in disrupting the relationship of Graham and Street. The series of events constitutes the history of the formation of a partnership by Graham and Street and the fraudulent conduct of Street and Siegel whereby the said property of the partnership of Graham and Street was used for purposes adverse to their partnership interests. It is not necessary to designate the type of action. The code only requires a statement of the facts constituting the cause of action in ordinary and concise language. Utah Code 1943, 104-7-2. While the language may not have been as concise as might be, the gist of the cause for complaint is the action of Siegel and Street in disrupting the partnership of Graham and Street and defrauding Graham. The prayer reveals the nature of the relief demanded, to wit:

"that an accounting be taken of all of the monies collected by the *defendants and each of them* * * * from the commencement of said partnership to the present time, and from the sale of the said partnership property." (Italics added)

The relief asked for in the original complaint related only to an accounting of dealings between Graham and Street and of moneys received and of partnership property. The relief sought in the amended complaint is based on the relationship between Street and Graham as well as the relationship between Siegel and Street and reflects the fraud of the latter two. The complaint, viewed in this fashion, required that Siegel be made a party. According to the complaint he was a very prominent actor in the drama which stretched from the alleged formation of a simple association verbally agreed upon between Graham and Street and affirmed by their conduct to operate for their mutual benefit and profit a caterpillar tractor, on through the transactions wherein a loan was solicited from Siegel, to the final denouement where Graham virtually found himself out as a partner and part owner of the "cat" and found that Siegel was in; where Graham, starting as a partner, found himself virtually supplanted by Siegel with Street having transferred his loyalty as Graham's partner to Siegel in some relationship excluding Graham and inconsistent with the partnership between Graham and Street. To determine the real status of Siegel and Street during the history of these transactions in reference to Graham and the situation in respect to ownership of the "cat" it was necessary to have Siegel joined as a party.

In Rowley's Modern Law of Partnership, Sec. 719, it is stated that:

"where one partner has formed a scheme or conspiracy inimical to the partnership with a third person, such fraudulent grantee or confederate may be made a party." See also cases cited in Note 89, p. 988 idem.

Even if the amended complaint be thought of as embracing two causes of action, one to declare the existence

of a partnership between Graham and Street and for an accounting by Street in respect to that partnership, and the other sounding in fraud to determine the legal and equitable status of the "cat" and to make Siegel account for his alleged participation in wrongfully diverting and withholding the property and earnings of the Graham-Street partnership, the two are so bound and interrelated that it would seem difficult to separate them. If it were possible to separate them and Graham had brought one action against Street and another action contemporaneously against Street and Siegel, the court, in the interest of practicable and economic procedure, would have had to consolidate them if indeed they may not have been considered as brought under Sec. 104-7-3, subd. 1, U. C. A. 1943, even though not separately stated. For the very reason that the successive transactions are so related and so blended into each other that they form one whole and complete episode, such separation would be difficult to accomplish. It is natural and logical to conceive of the complaint as constructed about the central transactions whereby Siegel allegedly insinuated himself in the Graham and Street relationship and look at the other allegations as matters leading up to or away from that central scheme. It is not required that a series of transactions so closely related in time and fact as to produce a substantial cause and effect transition be grouped and compartmentalized so as to fall into designated types of legal actions. The law serves life. Reformed pleading unlike that of common law is not a straightjacket which allows of no freedom of movement. Life and the books are replete with cases where the alleged wrong emanates or evolves from a series of related transactions in which various actors have played varying parts with varying degrees of guilt or delict. The wrong chosen from the whole of the facts as a basis for the action is nonetheless so because a separation and grouping of some of the transactions along the way may disclose other lesser or incidental wrongs which could themselves have been made the basis of causes of action

of a conventional type. In this situation neither of the defendants may require the plaintiff to split the pattern of this case into fragments to be tried as separate actions against separate defendants upon raising the cry of misjoinder of causes of action and of defendants. *Nunnelly et al* v. *First Fed. Bldg. & L. Ass'n of Ogden,* 107 Utah 347, 154 P. 2d 620, rehearing denied, 107 Utah 379, 159 P. 2d 141.

Counsel for Siegel and Street complains that he was misled in that the attorney for Graham indicated that he wanted Siegel in the case because Siegel was holding some funds of Street that he (Siegel) wanted to get rid of. The transcript does not bear this out. It hardly seems probable that Graham would join Siegel to accommodate Siegel's desire to get rid of moneys he was holding for Street. The part of the record quoted by appellants rather supports the view that Siegel was prepared to become a party so that his status and the disposition of moneys held by him would be determined. It may easily be that neither party saw clearly at that time the full possibilities or the reaches of the amended complaint. Nor from indications, did the court. It is extremely difficult in a case of intricacies for counsel or the court to fully and clearly discern at the outset the ramifications of pleadings and all their legal aspects and developments. That becomes impressed on the minds of the court and the parties as the educational process of the trial proceeds. Counsel for defendants intimates that because he thought the object of joining Siegel was to obtain a short cut to the matter of settling the disposition of moneys held by Siegel for Street, his objection to the amendment and the joinder was rather for the record and that for that reason he did not demur because of misjoinder of causes of action or parties. While the fact that Street was home from the Navy on furlough, and available as a witness for Siegel, may have had its part in persuading Siegel not to resist too strenuously on matters which would delay the trial, we think it quite probable that Siegel may have gained the impression that the issues raised

by the amended complaint would be limited to exclude matters of fraud or overreaching. But we do not see why he should have been so misled. Astute counsel for defendants must have given some significance to the allegations of paragraphs 6, 9, 10, 11, 12 and 13 of the amended complaint, many of which were entirely unnecessary to show a situation where Siegel was merely withholding money from Graham and Street and were of little service unless it was to reveal a situation where, on August 6, 1943, Siegel had been appealed to for a loan for the Graham and Street partnership. It was alleged that the partnership had been fully explained to him; that a statement of net worth of plaintiff and defendant had been furnished him; that Siegel had agreed to loan the money on security of the tractor to be purchased from the Bothwell Construction Company which was to be the property of the plaintiff and Street; that the terms of the loan were agreed upon; that a note and mortgage prepared by Siegel was signed by the partners; that plaintiff requested a copy of said note and mortgage; that Siegel promised to send a copy which he never did; that the Bothwell Construction Company tendered a bill of sale in the name of Graham but that Siegel refused to give his check until he was made grantee; that all said transactions represented the purchase of the equipment by the partnership of Graham and Street from the Bothwell Construction Company and the loan of money by defendant Siegel; that later, on or about September 20th, at his office, Siegel denied execution or existence of the note and mortgage above mentioned and suggested a partnership, the terms of which have hereinabove been set out, etc., etc. And certainly the allegations of paragraph eleven wherein it was alleged that the defendants conspired since August 23, 1943, to take possession and control of the property of the Graham-Street partnership must have given quite a good indication that plaintiff was accusing Siegel of getting the tractor put in his name so he could "pressure" the plaintiff for a "cut" of the profits after leaving him intentionally under the impression that

title in him, Siegel, was purely a mechanism to secure himself for the loan. We do not think that counsel for the defendants should have been misled as to the real purpose of the amendments and for the joining of Siegel. And if they were they have not been prejudiced. They had a full hearing. As it developed they should have been apprised of the necessity and purpose for the amendments and the joinder. A careful reading of the record does not suggest to us any other material evidence available to Siegel which he might have put in to further counter the charge and evidence of overreaching introduced by the plaintiff. If defendants did not wake up to the fact that the issue of ownership of the tractor was being tried until the oral decision of the court was rendered they reveal an innocence quite astounding in the light of the adroitness which the court evidently concluded had been exhibited in their dealings with Graham. There were the allegations we have above called attention to and there were 262 pages of testimony, much of which was quite obviously introduced as a basis for the inference that when Siegel took title in his name he led plaintiff to believe he did so for security only and that after he obtained it he used the title in an attempt to exact conditions which would have tended to yield a far greater amount than even the generous 9 per cent thitherto agreed upon and that he treated the property as his own. An intelligent listener in the court room could only with difficulty keep himself unaware of the fact that ownership was one of the issues in controversy. Siegel contends that no cause of action was stated as to him. Even after the rather sketchy review of the allegations in the complaint, together with our interpretation of them, it should be fairly apparent that his contention in that regard cannot prevail. He seems to be laboring under the idea that the plaintiff was under duty to have the contract of sale from the Bothwell Construction Company reformed to read as a mortgage and that there must be alleged as a ground work for obtaining such modification, fraud, accident or mistake. He fails to see that plaintiff is not predicating his action on

the fact that a bill of sale was obtained by Siegel by acci-dent or mistake. The bill of sale was intended to be made to Siegel. The fraud consists in Siegel using his title as a lever to exact more from Graham that the interest agreed upon and that for such purpose he either took the title with a secret intention of so doing, or, after taking title for security purposes only, later conceived of the scheme to use it for such excess exaction, and not succeeding in getting Graham to agree to a modification of what was a loan agreement he then used his title in connivance with Street to divert what was in reality Graham-Street equip-ment charged with a loan from that partnership, to his own purposes. It takes no reformation of a contract to establish that. No basis was intended to be laid for a fore-closure. If the shoe were on the other foot and Siegel was asserting that what was ostensibly a transfer of title to him was intended to be a mortgage there might be some point in his asking for a reformation.

This is an action in equity to have declared by decree the partnership between Graham and Street; to have the alleged conduct of Siegel treating himself as owner declared as fraudulent; and to make Siegel account for that property or the proceeds thereof as Graham-Street partnership property and for an accounting as to profits therefrom while it was controlled by Siegel con-niving with the allegedly faithless Street. This cause of action does not require a reformation of a contract in order to predicate an action on the reformed instrument. All that is asked in this action is to declare the status of the parties, the status of the equipment, and to obtain an accounting if it is found that a partnership existed be-tween Graham and Street and that such partnership owned the equity in the equipment bought from Bothwell Con-struction Co.

No errors were committed in permitting the amended complaint to be filed nor in the joinder of Siegel as a party defendant. From what has been said it is apparent that Siegel's contention that a cause of action was not alleged

against him and that he was misled must be rejected. We pass on to the next contention.

Was there a partnership between Graham and Street? This is an equity case. We examine the record to determine the facts. According to the rule laid down in *Stanley* v. *Stanley*, 97 Utah 520, 94 P. 2d 465, if it is debatable whether the record supports the lower court, we affirm because the factor of credibility of witnesses discernible through demeanor is one which the record does not ordinarily reveal to us but which may have materially influenced the trial judge. That principle is especially applicable in this case. There was an irreconcilable conflict between the testimony of Graham on the one hand and Street and Siegel on the other regarding what was said at the different meetings of the parties. Even the record reflects with some vitality the credibility of the witnesses ·or the lack of it. It reveals Graham as an out-of-doors man who, like many small contractors, relied on the word of the men with whom he was dealing. His testimony gives evidence of one who is trying correctly to recollect and convey events as he sensed and understood them. His testimony shows impetuosity and eagerness borne of an anxiety to pour forth *in detail* the conversation and actions of the parties as they were in his mind. At times in his eagerness he had to be stopped by his counsel. He testified that he was a member of the firm of Clyde, Probst and Graham, contractors engaged in excavation, land leveling, construction, etc.; that that firm had work at Heber and on the desert in Wasatch County; that he had to "pull" his "cat" (caterpillar tractor) off the job at Heber in order to do excavating for the Ohran Construction Company on a Federal Housing project in American Fork; that Street was "cat skinning" for his firm at that time; that there was such a rush of work and he was so anxious to get back to their work at Heber that they doubled up and put on an extra skinner; that he had been looking for and finally spotted another "cat" at the Bothwell Construction Company; that he and Clyde went to look at it before he

said anything to Street; that his firm was not interested in purchasing; that he therefore made arrangements with Bothwell to buy and in fact made an offer in writing which Bothwell verbally accepted; that a bill of sale was made from Bothwell Construction Company to Graham; that in July, 1943, he talked to Street who was working for him about going in as partners on the "cat"; that he told Street that he could finance it himself but he wanted Street interested because skinners were hard to get and he wanted Street obligated as a partner; that he and Street went to Bothwells to look at the "cat"; that Street thought it would do if some repairs were made and that he, Street, was willing to go in with him as a partner; that Street suggested going to Siegel to get the "cat" financed; that accepting that suggestion, he and Street went to see Siegel; that they told Siegel what they had in mind and furnished statements of what property they had.

We shall at this time omit further transactions with Siegel at this juncture because they must fit in better with the next phase of this case. We shall skip over that evidence and proceed with those occurrences after that time which throw light on the relationship between Graham and Street after plaintiff and Street left Siegel's office. Street started to repair the tractor at the Bothwell shop. On that day Graham helped to overhaul the "cat"; that after it was overhauled about August 16th it was taken on the job which Clyde, Probst and Graham had with Ohran Construction Company at American Fork, Utah, and which had been relinquished to Graham; that a telephone was installed in Street's house in the name of Graham and Street; that Graham opened an account with the Ohran Construction Company in the presence of Street in the name of Graham and Street; that Graham had fuel ration certificates issued in the name of Graham and Street to obtain gas for this "cat"; that Graham bought cable for it and left it at Street's house; that Street was to get $1.25 an hour for running the "cat" on the Ohran jobs before a division of profits; and that about August 26th Graham

and Street went down to look over another job of excavating for Garf and Nelson and obtained a contract. Graham testified that he had excavating contracts with the Ohran Construction Company. While this was not quite accurate it is apparent from the evidence that his firm of Clyde, Probst and Graham did have the entree to the excavation of certain housing projects which the Ohran Construction Company was building. The fact is that caterpillar tractors were scarce and he who owned one by virtue of his control had the choice of jobs. In order to show that Graham's interest in the alleged partnership was at best nominal, it is strenuously urged that Graham only contributed $15.00 to the venture. He had, however, arranged with the Bothwell Construction Company for a purchase of the equipment. Granting to Street the right to share in that purchase was a contribution. His firm of Clyde, Probst and Graham had the entree to jobs. They relinquished in favor of Graham. Certainly a partnership may be formed between two men to operate equipment which they both own, although mortgaged for the full purchase price. The equity in the machine if any and the contract to excavate which will yield returns whether the contract is express, implied or for pay by the unit, is the partnership capital.

We conclude that not only was there an intention on the part of Graham and Street to become partners but that they actually consummated the partnership and were partners from about August 6, 1943. The court's finding in that respect must be upheld.

There is not much conflict in the evidence in reference to the above details. Street who testified in favor of Siegel and himself gave expression to some minor variations of testimony but he did not deny the substantial part of the events enumerated above. The real conflict appears in the rest of the testimony.

Oddly enough, the defendants do not assign as 13, 14 error the finding No. 11 that

"defendants have conspired to take possession of the partnership property of Graham and Street, to collect and misappropriate the funds

earned in the operation of the equipment on the contracts of Graham and Street, and to exclude plaintiff from any management or control of said partnership business, and have continued to operate the said partnership equipment and business until January 12, 1945, collect all monies from the operation thereof and appropriate said monies to their own use".

Evidently the defendants relied on convincing us that no partnership had come into existence, but if it had come into existence it had been terminated. Or perhaps they concluded that their assignment that the court was in error in finding that the partnership had executed a note in the amount of $4500 to Siegel would, if the error were established in that respect, impliedly negate any finding of conspiracy. It does not by any means follow that if Graham was mistaken as to the existence of a note and mortgage for $4500, that the title was taken by Siegel for himself and not as security for a loan to the partnership. A scheme to use the title to defraud the partnership only becomes more probable if a note and mortgage for $4500 was signed by the partnership and delivered to Siegel. But if it were not given the court would still have to determine from all of the circumstances preceding and attending the dealings with Siegel whether or not he and Street had conspired to defraud Graham from the fruits of having located and arranged for the purchase of the tractor and for its operation by Street as a partner. We therefore proceed to analyze the evidence in respect to a conspiracy or fraud. Unfortunately it must be done with some refinement. Men do not publish their fraudulent intentions. Such must be inferred from their statements or actions. The evidence must be most carefully examined where the situation is one where it is claimed that the party who took title to an article did so for the purpose of furthering a fraudulent scheme, or that if he first took title as security, he later, actuated by venality, embarked on a scheme to defraud those who solicited his services as a lender. That we have done. We have concluded that the finding that there was a conspiracy as alleged must be

upheld. Even without having the witnesses before us the record rather preponderates in favor of such finding. But the court saw the witnesses. It had to choose between Graham and Siegel as to credibility. Street supported Siegel but with some difficulty. It took pages of examination at times to get the desired answer to a simple question. Street's testimony gives the impression that he would have been more at home if he had not been under constraint to make his testimony square with Siegel's theory and that he was the kind of man who is not adept in keeping from contradicting himself in a situation which was derived more from a concoction than from actuality. We mention at this time one instance which would have stamped either Graham or Siegel as a mistaken or untruthful witness. Siegel testified that *after* the plaintiff and Street *first* came into his store around the first of August, they met that same or the next night at Street's house in American Fork and had a lengthy discussion in which he, Siegel, told them he would not finance the "cat" but that he would buy it and lease it to them for about a third of the net profits. Graham denies that there was a meeting at American Fork *next after* the first meeting with Siegel at the office of the latter at Salt Lake. Graham's testimony is that according to his time sheets Street worked at Heber City until the night of August 5th. Graham states that next he and Street came to Salt Lake and went to see Bothwell at which time Street looked over the "cat" as mentioned above; that after that they repaired at Street's suggestion to Siegel's and told him that they wanted to finance the "cat"; that Siegel told them to come back in an hour; that they did return in an hour or two and that Siegel told him he would loan them the money. Street corroborates these two visits to Siegel and the visit to Bothwell as apparently being on the same day but denies that Siegel told them he would finance the "cat", but said he would buy it. Be that as it may, Graham further testified that they then went back to Bothwell for the bill of sale and returned with Bothwell to Siegel's when Siegel insisted that

title be made to him and that the bill of sale was then changed from Graham's name to Siegel's. Bothwell corroborates the meeting at Siegel's office although he was not clear as to what date the bill of sale had first been made in the name of Graham. Piecing together the testimony of Street, Graham and Bothwell, we must conclude that Graham and Street went to Siegel's three times in one day and to Bothwell's twice and that this was the same day when Graham was first introduced to Siegel and that the deal had been concluded on that day. This is borne out by the fact that Graham and Street worked on repairing the tractor on August 7th, which Graham said was the day after the deal was completed. It would be unlikely that either party would have done repair work on the tractor until in their minds at least they considered the tractor belonged to them. Moreover, as will appear more specifically hereafter, if all those meetings took place on August 6th in Salt Lake City there would have been no chance for a meeting to take place at American Fork with Siegel at any time on that day between the time Graham first met Siegel and the final meeting on the same day when Siegel gave his check for $4500 to Bothwell. It would, furthermore, be natural that before that check was given the parties would have arrived at an understanding. Graham testified that on August 7th, the day after the meetings in Siegel's office, he and Street came down to Salt Lake and that they worked all day at Bothwell's repairing the "cat"; that on that same evening he drove Street to the latter's home in American Fork and that Mr. and Mrs. Siegel drove up behind Graham's car just after the latter had arrived at Street's home; that they all stood talking at the edge of the road; that he, Graham, never went into the house; that he only stayed a short time because he had to go and see Owen Dean about a gravel pit deal and that he left Mr. and Mrs. Siegel and Mr. and Mrs. Street at the edge of the road; that nothing was said about the contract except that he might have informed Siegel that they had started repair work at Bothwell's; Graham says that when

he and Street were coming home on August 7th Siegel passed them in his car whereupon Graham remarked to Street that he guessed Siegel was on his way to get Mrs. Street's signature on the note and the mortgage on Street's trailer which the latter had previously signed and in regard to which mention will be made later in this opinion.

So here we see a most material difference in testimony between Siegel and Graham because Graham testified that the only time he saw Siegel at American Fork was on the night of August 7th at the edge of the road *after* August 6th, the day when he testified the transactions with Siegel took place at Salt Lake City and the deal was completed. If Graham is correct Siegel is, to say the least, mistaken as to a meeting in American Fork earlier in the month after the *first* meeting at Siegel's office in Salt Lake City in which case, of course, he could not have at American Fork suggested a three way agreement which was approved by Graham and Street.

The court chose to accept Graham's credibility as against Siegel's and this makes Graham's narrative the accepted one. And at the risk of slight repetition the testimony of Graham is that after he and Street had been to Bothwell's where Street looked over the "cat" which, with the most probable and consistent articulation of the evidence, was on the morning of August 6th, they went to see Siegel. This was the *first* time Graham had met Siegel. They told Siegel they wanted him to finance the "cat" and gave him a statement of their combined assets; that Siegel told them to return in an hour; that they did return at which time he told them that they could have the money; that he and Street signed a note for $4500.00, drawing 9% interest, and a chattel mortgage in blank to secure it; that at the same time he turned over to Siegel a title certificate to his truck in the name of Good from whom he had bought it because he had not yet had title transferred to him; that Street at the same time turned over an ownership certificate to a house trailer in Street's name; that these were to be additional security for the loan; that they then went to the

office of the Bothwell Construction Company and returned to Siegel's office with Roy Bothwell; that Bothwell handed to Siegel a bill of sale to the tractor made out in the name of Graham but Siegel said he would not accept it unless it was made to him; that the bill of sale was redrafted with Siegel's name inserted in place of Graham's; that Siegel then delivered to Bothwell a check for $4500; that Siegel stated he would have his attorney complete the mortgage and send Graham a copy whereupon Street and Graham left. Graham stated that he never received a copy of the note and mortgage as had been agreed. Siegel claims as before stated, that at American Fork it was agreed that he would buy the "cat" and lease it to Graham and Street for one-third of the net profits as rental; that when they left on the 6th of August, after the purchase of the "cat", it was understood that they would come back and sign such agreement which he was to have his attorney draw up; that Graham did not come back; that Street tried to get him to come in to see Siegel and that on September 22nd he did come in. Graham said he came in on the 22nd of September to see why he did not get his copy of the note and mortgage; that that was the first time Siegel broached the three-way deal. All three witnesses admitted that Graham became very ruffled when Siegel spoke of the three-way deal and said that he, Graham, would have nothing to do with it. There seems to be no doubt that Graham was very much surprised and indignant at Siegel's suggestion of a three-way agreement which is a potent indication that he had not been thitherto approached in that regard at American Fork or elsewhere.

The matter then stands thus: That Graham at least on August 6th upon leaving Siegel's office, was definitely of the impression that he and Street were to own the tractor; that Siegel had taken the machine in his name only as security; that he, Graham, and Street had obligated themselves on a note for $4500 for the machine and that they had put up their truck and house trailer as additional security.

Because at this point it becomes necessary to consider two blank notes and two mortgages made in blank, signed by Graham and Street respectively, offered but not received in evidence which rejection is assigned as error, this is perhaps the most appropriate time to ▮ consider the motion of the defendants to reopen the case made after the court had handed down its memorandum decision finding the issues in favor of Graham. The motion was made for the purpose of introducing two notes and chattel mortgages signed in blank by Graham and Street, respectively, and running to the Siegel Finance Company. Siegel claimed that he had no opportunity during the three days of trial which was held in Provo, Utah, to get to the security box at the bank during banking hours. The court refused the motion giving his reasons at length. However, the blank notes and mortgages were sent up with the record as proposed exhibits and error assigned for not reopening the case and admitting them. It was Siegel's contention that Graham had testified that he had only *one* note and mortgage at the time of the second meeting on August 6th and since Siegel produced one note signed by him which did not contain the sum of $4500.00 or any sum but was in blank and a mortgage form signed in blank that it completely negatived Graham's testimony and showed that Siegel's testimony was correct, and that, therefore, the refusal to reopen the case and admit the proposed exhibits was prejudicial error. We do not think so. In the first place we find nothing in the testimony wherein Graham said that he signed only one note and mortgage. What he did say was that he and Street signed *a* note completed for $4500.00 and a blank mortgage to secure it. Secondly, if the testimony is susceptible of the inference that he only signed one note and mortgage—two papers and not two notes and a mortgage or two mortgages—the fact that a blank note is produced is certainly not conclusive that he did sign a note for $4500. In the general signing of papers he may not have realized that he had signed three or four instead of two. The argument runs that he said he only

signed one note and mortgage and since a note he did sign was produced and it contained no sum, let alone the sum of $4500, it must result that his testimony that he signed a note for $4500 was entirely discredited and hence his testimony that the transaction was a loan must be disbelieved and Siegel's testimony believed that it was not a loan transaction but a purchase by him, Siegel, for his own purposes. Such argument is certainly not conclusive in view of all the other circumstances of this case. The court, therefore, having before it the two blank notes and mortgages concluded that if they were admitted, it would not change his opinion. There is some basis for thinking it might have strengthened it. There was, therefore, no abuse of discretion in refusing to open the case and to admit these two blank notes and two blank mortgages. However, the blank notes and mortgages made to the *Siegel Finance Company* at the second meeting with Siegel on August 6th are before us. They may throw some light on the nature of the transaction. Siegel testified that the second meeting of him, Graham and Street was held at American Fork. We have already given reasons why this does not jibe with the pattern of the evidence. The lower court wondered, and so do we, why a note would be given to assure the rental of a chattel. What sum to secure its proper use and care was to be inserted in the blank notes of Street and Graham? Certainly the giving of those blank notes and mortgages was more consistent with an intent to secure a loan than to assure compliance with a rental agreement. The matter then sums up to this: Siegel was informed that Graham had made a bargain for the purchase of the Bothwell tractor. He knew that Street and Graham came to him to finance it. He had them sign a note for $4500 with interest. He had them sign two notes and mortgages in blank to cover Graham's truck and Street's trailer. When Bothwell came over with the bill of sale made to Graham he insisted that it be made to him. He did not surrender the ownership certificate to the truck and trailer. He did not say the loan deal was off and he was

going to own the tractor. He knew that Graham at least was under the impression when he left Siegel's office that Graham and Street were really owners of the tractor and that Siegel had advanced money as a loan. Knowing that and knowing that he had told them he would finance or loan them the money he did not disillusion them. He permitted them to leave, aware of their belief that they *owed* him money. Later he had Street attempt to get Graham in his office and on September 22nd finally succeeded. At this meeting for the first time he told Graham that he, Siegel, was owner of the tractor and that he would rent it to Graham and Street for one-third of the profits. Graham immediately showed unfeigned indignation and refused to accede to any such proposition. Between August 6th and September 22nd, Street went to the Ohran Construction Company and asked them to change a check for work made out to Graham and Street to the name of Street alone, stating that he was not able to get in contact with Graham when he knew Graham was readily available. On August 24th that change was made, yet thereafter on August 26th Graham took Street down to look at a job for Garf & Nelson, thinking all the time Street was loyal to him and that they were partners, Street never mentioning that he had repudiated the partnership. Siegel went to the Ohran Construction Company and told them that he was the owner of the tractor and that he had rented it to Street and to make the checks out only to Street. This the Ohran Construction Company did, although the account was still left in the name of Graham and Street. The money which the Ohran Construction Company was at that time paying was derived from the very job which Graham had obtained for himself and Street which Graham's firm of Clyde, Probst and Graham had relinquished. Even before September 22nd, Street was evidently dealing with Siegel, turning over the profits to him. After September 22nd, he refused to account to Graham telling him it was none of his business. The significance of one fact is that Siegel had the blank notes and mortgages made out to the Siegel

Finance Company, which company is composed of himself, his brothers and his mother. Evidently the transaction with Graham and Street started out as one with the Siegel Finance Company. Siegel testified at the trial that the bill of sale was made to him personally and that the deal was his individually and had nothing to do with the Siegel Finance Company. When did Siegel change in his intention to treat the deal as his perosnally after apparently starting out with papers made to the Siegel Finance Company? All these facts and others when fitted together and made to illuminate each other lead us to conclude that there was an intention on Siegel's part to get control of the "cat" which he knew he had led Graham to believe he was financing for the partnership of Graham and Street. By taking title in himself and the notes from Graham and Street he was in position to go either way events would dictate to be to his interest. If the tractor lost money it would be a loan. If it made money it would be his with a right to one-third of the profits. It was evident from the beginning that tractors were scarce and work was plentiful. The "cat" could probably have been sold for as much or more than it cost. And in this scheme to convert himself from a lender for interest to an owner and renter demanding profits he induced Street to join him. We think, taking all the evidence together, there is implicit in it the conclusion arrived at by the lower court and independently by us.

There remains to consider the contention of the appellant that if there ever was a partnership between Graham and Street it terminated on September 22nd, 1943. The evidence is that on September 22nd, when Graham learned what Siegel wanted him to agree to, he said he would have none of it; that there was talk of each buying out the other; that Street was willing to take his wages and call it quits; that Siegel was willing to take $300 for his "interest" and let Graham have the "cat." But no agreement was reached. Graham thought his interest worth at least $1,000. They parted without any agreement to

terminate; therefore, there was no termination on that date. *Spears* v. *Willis* 151 N. Y. 443, 45 N. E. 849.

We do not need to determine whether the partnership was otherwise terminated by the acts of Street in treating the sole piece of partnership property around the operation of which the partnership revolved as the property of another and dealing with that other inconsistently with his partnership with Graham. A partnership at will may be dissolved by one partner unequivocally bringing home notice to the other partners that he no longer intends to be a partner. *Pierce* v. *Feno, Sup.*, 184 N. Y. S. 851; *Brady* v. *Powers*, 112 App. Div. 845, 849, 850, 98 N. Y. S. 237; *Spears* v. *Willis*, 151 N. Y. 443, 449, 45 N. E. 849; *Houston* v. *McCrory*, 140 Okl. 21; 282 P. 149. And he may commit such acts as would form a ground for dissolution in equity. *Moore* v. *Price*, 116 Ala. 247, 22 So. 531; *Carroll et al.* v. *Cunningham*, 73 Neb. 295, 102 N. W. 608; *Lavoine* v. *Casey*, 251 Mass. 124, 146 N. E. 241; *Frankfort Const. Co.* v. *Meneely*, 62 Ind. App. 514, 112 N. E. 244. Street did not notify Graham that the partnership was at an end.

In this case Street used property belonging to the partnership, treating it as belonging to Siegel, refusing to account to Graham for the moneys collected for the use of the tractor, but the property will in equity be considered as being used for the benefit of the Graham-Street partnership and accounting of profits required to be made to this partnership.

If the partnership ceased to exist in fact by the conduct Street brought home to Graham or by the answer of Street denying the partnership filed May 29th, 1944, which must be considered notice to Graham, or after the sale of the property on January 12, 1945, equity will nevertheless treat the partnership as existing and require an accounting of the profits. Equity will not permit a party in a relationship of trust and confidence to profit from his own wrong.

The decree of the lower court, dated June 15th, 1945, is affirmed.

LARSON, C. J., and McDONOUGH, TURNER, and WADE, JJ., concur.